Virginia M. MARQUES, Plaintiff,

v.

BANK OF AMERICA, et al., Defendants.

No. C96–1932 TEH.

United States District Court, N.D. California.

June 16, 1999.

1006

Kathleen M. Lucas, Thomas E. Duckworth, The Lucas Law Firm, San Francisco, CA, for Plaintiff.

Patricia K. Gillette, Cynthia J. Girffith, Andrew R. Livingston, Emily J. Gould, Heller Ehrman White & McAuliffe, Kenneth D. Hoffman, Jay J. Price, Office of the General Counsel, Bank of America, NT & SA, San Francisco, CA, for Defendants.

### ORDER DENYING JUDGMENT AS A MATTER OF LAW

HENDERSON, District Judge.

Presently before the Court is defendant's renewed motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b). At the close of evidence on plaintiff's claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, the Court denied defendant's initial motion for judgment as a matter of law. The jury returned a verdict for plaintiff on her claim of age discrimination, but rejected her claims of retaliation, national origin and gender discrimination under Title VII. The jury awarded plaintiff $226,266 in lost back wages and employee benefits and $212,965 in lost future earnings and benefits. Defendant immediately renewed its motion for judgment as a matter of law after trial. Having carefully considered the evidence adduced at trial, the applicable law and the parties' oral arguments, the Court denies defendant's motion for the reasons set forth below.

### I. FACTUAL BACKGROUND

Virginia Marques began working for Bank of America in 1956 as a teller. During her 37 year career with Bank of America (the "Bank"), she worked her way up to the position of grade 81 Vice President in the Fremont Regional Credit Administration ("RCA") office. Her performance was well regarded and she received regular promotions. Prior to June 1994, the Bank divided its California RCA offices into four regions: the Southeast RCA located in San Diego, the Los Angeles/Orange County RCA located in Brea, the Central/Northern California RCA located in Rancho Cordova, and the Bay Area RCA located in Fremont. Each of the offices provided credit administration support for consumer and commercial lending in its region. Loans came to the Bay Area and Central/Northern California RCA's for review through an intermediate office called the Loan Center, located in Rancho Cordova, which was responsible for processing and servicing loans that came through the branches or telephone applications. Similarly, loans for the Southern California RCA's were first channeled through a Loan Center in Brea.

The RCA's were charged with handling loans above the approval authorities delegated to the Loan Centers, and dealing with special portfolios or transactions involving exceptions. In each of the RCA's, a grade 84 credit officer directly supervised two grade 80–82 credit officers along with administrative support staff. All but one of the officers in the four RCA's were over 40. Thus, in Fremont in early 1994, Jerry Scott (grade 84, age 52) supervised Ms. Marques (grade 81, age 57), who handled consumer lending, and George Heiler (grade 82, age 46), who handled commercial lending. In Rancho Cordova, Dave Cristofani (grade 84, age 52) supervised Ron Jeffers (grade 82, age 53), and Jim Jackson (grade 80, age 43). A similar structure prevailed in the southern California RCA's.[1]

---

1. In San Diego, Larry Geerdes (grade 84, age 52), supervised Richard Thilken (grade 82, age 61), and Richard Darling (grade 80, age 52). And in Brea, Margaret Paloney (grade 84, age 49), supervised Joanne Dew (grade 82, age 49), and Diane Myers (grade 82, age 37). Ms. Myers was the only officer under 40 in the four RCA's.

In the spring and summer of 1994, however, the Bank decided to centralize and consolidate the RCA's by closing the offices in Fremont and San Diego. The work done in these RCA's was transferred to the Rancho Cordova and Brea RCA's, respectively, to be near the two Loan Centers.[2] According to the consolidation plan, a grade 84 position in each location would supervise a senior (grade 80–82) credit administrator selected from existing Rancho Cordova and Brea staff, as well as a junior (grade 79) credit officer.[3] Thus plaintiff's consumer lending work and the commercial lending work of George Heiler were combined into a single position in Rancho Cordova, and the work of Richard Darling and Richard Thilken was consolidated into a single position in Brea.

The decision was announced to the Fremont RCA officers by senior managers Bill Williams and Hal Arneson along with Candy Jackson (from Human Resources) at a meeting called on June 28, 1994. Mr. Scott, Mr. Heiler, Ms. Marques and administrative support personnel were informed of the office closure and that they would all have to find other jobs within 90 days. If they failed to find work within 30 days, they would be placed in the Employee Transition Program—a program according to which employees are paid but given no work responsibilities for two months so that they can find another job. The staff in San Diego received the same news.

Mr. Scott testified that he was informed of the office closure at a private meeting with Bill Williams and Hal Arneson just before the meeting with the others. At this earlier meeting he was offered the supervising RCA officer position in Rancho Cordova and told that there would be a senior credit administrator and a grade 79 under him if he took the job. The next day Jerry Scott called Bill Williams and accepted the new Rancho Cordova position. Shortly thereafter, Bill Williams decided to pull Jim Jackson from Dave Cristofani's existing Rancho Cordova staff to fill the senior credit administrator position under Jerry Scott. The grade 79 position, which had been offered to but declined by both plaintiff and George Heiler, remained open through July and August 1994.[4]

After the June 28, 1994 announcement, plaintiff and others in the Fremont office were shocked. Plaintiff took a number of days off and Scott, who had only recently moved to the Bay Area, had to prepare for the move to Rancho Cordova. There was also confusion in the office about the structure of the reorganized Bay Area work in Rancho Cordova. First, Jerry Scott assumed that he had authority to fill the positions below him. Second, plaintiff did not know or understand or believe that the senior credit administrator position under Scott was to be filled from *existing* Rancho Cordova staff. In oral and written communications with Scott and Candy Jackson, plaintiff first offered to take the open grade 79 position in Rancho Cordova provided that she take no salary or grade reduction. Lucas Decl., Ex. F (July 26, 1994 Ltr.). She then asked to be considered for a nonexistent "grade 82" position in Rancho Cordova. *Id.*, Ex. G (July 27, 1994 Ltr.).

On August 4, 1994, Candy Jackson wrote to plaintiff, explaining that the offer for the grade 79 position was still open with relocation assistance if she was willing to take a 10% pay cut along with the grade reduction. *Id.*, Ex. G. Candy Jackson also clarified that although the senior

---

**2.** In 1991, the Bank consolidated its four original Loan Centers (in Fremont, Rancho Cordova, Brea and San Diego, just like the RCA's) into Rancho Cordova and Brea.

**3.** Originally, the Bank planned to have only a senior credit administrator under the grade 84 position, however, Bill Williams raised

concerns that this might be too drastic and successfully lobbied for the addition of a grade 79 position.

**4.** In San Diego, Larry Geerdes accepted the new grade 84 position in Brea. Diane Myers (grade 82) was pulled from existing Brea staff to work under Geerdes.

administrator position in Rancho Cordova would eventually increase to a grade 82, it was presently a grade 80, and had already been filled. Plaintiff wrote back to Candy Jackson on August 8, 1994, asking for an explanation why she had not been considered for the grade 82 position in Rancho Cordova, implying that after her July 27, 1994 letter to Scott, he promised to arrange an interview for the position, and stating that she only wanted to be denied the position based on her qualifications, rather than her status as "a woman, over 40 years of age, Hispanic ...." *Id.*, Ex. I. She further asked Candy Jackson to "hold these questions and your answers in confidence." *Id.* The next day, Candy Jackson wrote back to "reiterate that there currently is no open grade 82 position in existence" in Rancho Cordova, that the grade 79 position was still open, and that plaintiff was free to apply for other positions within the Bank. *Id.*, Ex. J. Apart from the jobs in Rancho Cordova, plaintiff only pursued three other job opportunities with the Bank prior to her termination on September 27, 1994. She unsuccessful applied for jobs in credit policy reporting and credit exam reporting, and she expressed interest to Jerry Scott in a job with a manager he knew in indirect lending.

## II. LEGAL STANDARD

A motion for judgment notwithstanding of verdict has been renamed a renewed motion for judgment as a matter of law. *See* Fed.R.Civ.P. 50(b). According to Rule 50(b), if a verdict is returned by the jury, the district court may allow the judgment to stand, order a new trial, or direct entry of judgment as a matter of law. However, a renewed motion for judgment as a matter of law may not be considered unless it is preceded by a motion for the same relief at the close of all the evidence and filed no later than 10 days after the entry of judgment. Fed.R.Civ.P. 50(b).

In the Ninth Circuit, "[j]udgment as a matter of law is appropriate when the evidence, construed in the light most fa-

vorable to the nonmoving party, permits only one reasonable conclusion, which is contrary to the jury's verdict." *Omega Environmental, Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1161 (9th Cir.1997), *cert. denied,* —— U.S. ——, 119 S.Ct. 46, 142 L.Ed.2d 36 (1998); *see also Baker v. Delta Air Lines, Inc.*, 6 F.3d 632, 644 (9th Cir. 1993) (court " 'must determine whether the evidence, considered as a whole and viewed in the light most favorable to the nonmoving party, reasonably can support *only* a verdict for the moving party' ") (emphasis original) (quoting *Gillette v. Delmore,* 979 F.2d 1342, 1346 (9th Cir.1992)). In other words, judgment as a matter of law may be granted "[i]f during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue ...." Fed. R.Civ.P. 50(a)(1); *Juhnke v. EIG Corp.,* 444 F.2d 1323, 1325 (9th Cir.1971) (noting that directed verdict and motion for judgment notwithstanding verdict "are measured by the same standard as the latter is merely a renewal of the former") (citations omitted).

In considering a motion under Rule 50(b), "the district court is not free to weigh the parties' evidence or to pass on the credibility of witnesses or to substitute its judgment of the facts for that of the jury." 9A Charles A. Wright & Arthur R. Miller, FEDERAL PRACTICE & PROCEDURE: CIVIL 2d § 2524, 255–56 (1995) (internal citations omitted); *see Baker,* 6 F.3d at 644 (same); *Mosesian v. Peat, Marwick, Mitchell & Co.,* 727 F.2d 873, 877 (9th Cir.1984). ("Neither the district court nor this court may weigh the evidence or order a result it finds more reasonable if substantial evidence supports the jury verdict."). As the Ninth Circuit has emphasized, where the evidence permits of conflicting inferences, the court is not at liberty to select an inference over one chosen by the jury:

> [W]e are "bound to view the evidence in the light most favorable to [the pre-

vailing party] and to give [that party] the benefit of all inferences which the evidence fairly supports, even though contrary inferences might reasonably be drawn." *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 696, 82 S.Ct. 1404, 1409, 8 L.Ed.2d 777 (1962).... It is the jury, not the judge, which "weighs the contradictory evidence and inferences, judges the credibility of witnesses, receives expert instructions, and draws the ultimate conclusion as to the facts.... Courts are not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions because judges feel that other results are more reasonable." *Tennant v. Peoria & P.U. Ry.*, 321 U.S. 29, 35, 64 S.Ct. 409, 412, 88 L.Ed. 520 (1944).

*Cockrum v. Whitney*, 479 F.2d 84, 86 (9th Cir.1973) ("on motion for JNOV, reversible error for judge to choose an inference contrary to that drawn by the jury). Finally, in reviewing the evidence, [t]he record should be taken as it existed when the trial closed," *Schudel v. General Elec. Co.*, 120 F.3d 991, 995 (9th Cir.1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 1560, 140 L.Ed.2d 792 (1998), and if the jury's verdict is supported by substantial evidence, it must be affirmed. *Kern v. Levolor Lorentzen, Inc.*, 899 F.2d 772, 775 (9th Cir. 1990) (citing *William Inglis & Sons Baking Co. v. ITT Continental Baking Co.*, 668 F.2d 1014, 1026 (9th Cir.1981)). A renewed motion for judgment as a matter of law is reviewed *de novo* by the appellate court. *Omega Environmental*, 127 F.3d at 1161.[5]

## III. DISCUSSION

"Since judgment as a matter of law deprives the party opposing the motion of a determination of the facts by a jury, it should be granted cautiously and sparingly." 9A Charles A. Wright & Arthur R. Miller, FEDERAL PRACTICE & PROCEDURE: CIVIL 2d § 2524, 252 (1995) (citing precedent). The Ninth Circuit has acknowledged this prescription, noting that on renewed motions for judgment as a matter of law, "[j]ury verdicts are due considerable deference." *Kern*, 899 F.2d at 775; *see also William Inglis*, 668 F.2d at 1026 ("we are mindful of the deference due the verdict of a jury"). This is all the more true in the context of employment discrimination suits where discriminatory animus is a fact so infrequently amenable to proof by direct evidence and therefore so appropriately surrendered to the province of the jury.[6]

---

**5.** Plaintiff's counsel suggests that it is categorically improper to rely on summary judgment case law in considering a Rule 50(b) motion. However, since the Supreme Court has noted that the summary judgment standard "mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a)," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986), this Court perceives no defect in relying on summary judgment precedent, particularly to the degree that such cases delimit permissible inferences to be drawn, as a matter of law, from evidence typically submitted in discrimination suits.

**6.** As the Seventh Circuit has noted in considering evidentiary exclusions in a discrimination case:

> Defendants of even minimal sophistication will neither admit discriminatory animus nor leave a paper trail demonstrating it;

and because most employment decisions involve an element of discretion, alternative hypotheses (including that of simple mistake) will always be possible and often plausible.... [I]t is so easy to concoct a plausible reason for not hiring, or firing, or failing to promote, or denying a pay raise to, a worker who is not superlative. A plaintiff's ability to prove discrimination indirectly, circumstantially, must not be crippled by evidentiary rulings that keep out probative evidence because of crabbed notions of relevance or excessive mistrust of juries.

*Riordan v. Kempiners*, 831 F.2d 690, 697–98 (7th Cir.1987); *see also Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1082 (3rd Cir.1996) ("The sophisticated would-be violator has made our job a little more difficult. Courts today must be increasingly vigilant in their efforts to ensure that prohibited discrimination is not approved under the auspices of legitimate conduct ....").

Nevertheless, where the evidence simply cannot bear the conclusion drawn by a jury, it is incumbent upon the Court to intervene. For the benefit of all involved, the line between discriminatory and non-discriminatory conduct must not fail of demarcation simply because it is often difficult to prove whether the line has been crossed.

Here the Court confronts a claim of age discrimination which even plaintiff concedes is "somewhat subtle." Plf's Opp. Mem. at 8. In the two employment decisions at issue (failing to select plaintiff for the consolidated senior credit administrator position in Rancho Cordova, and failing to hire plaintiff for another position with the Bank), evidence that age was a motivating factor is relatively scant. Nevertheless, at least as to the latter decision, the Court is unable to conclude that there was insufficient evidence to support the jury's verdict.

### A. Failure to Select Plaintiff for the Senior Credit Administrator Position in Rancho Cordova

Plaintiff claimed at trial that the Bank failed to "seriously consider" her for the senior position reporting to Jerry Scott in Rancho Cordova.[7] She also characterized this claim as the Bank's decision to "replace her" with Jim Jackson, a younger man. At trial, the Bank offered evidence to establish the legitimate business reasons for closing the Fremont office, transferring the Bay Area Region work to Rancho Cordova, and pulling Jim Jackson over to the newly consolidated Bay Area RCA. First, there is undisputed testimony in addition to documentary evidence that the consolidation was part of a long term strategy for the Bank's California loan function. The consolidation began back in 1991 when the Fremont and San Diego Loan Centers

were consolidated into Brea and San Diego, and it progressed in 1994 with the closure of the Fremont and San Diego RCA's.

Second, the Bank demonstrated that there were valid strategic and financial reasons for the consolidation. Undisputed testimony established that loan volumes in the RCA's were declining in response to a concomitant increase in the loan authorities of the Loan Centers as well as a general decline in loan volume across the state. The Bank also hoped that increasing the Loan Center authorities would "provide better customer service by getting the decision maker closer to the customer." Gillette Decl., Ex. 19. Rather than bouncing loan applications up to the RCA's, Loan Centers could handle them on their own. Moreover, consistent with the consolidation of the Loan Centers, moving the Bay Area RCA work to the existing credit facility in Rancho Cordova and the Southeastern California work to the facility in Brea would eliminate the more geographically remote RCA's and allow the Bank to use existing staff in Rancho Cordova and Brea to fill some of the newly opened positions. The Bank presented evidence that this would result in efficiencies insofar as it reduced RCA personnel/salary, put more employees under the same roof, and avoided relocation costs.

Defendant also offered evidence that Jim Jackson was qualified to take on the combined commercial/consumer lending position once performed by plaintiff and Mr. Heiler. He had the authority to review both consumer and business loans up to $750,000, substantial experience in credit administration, strong performance reviews, and had worked with Jerry Scott in the past. Finally, the Bank offered evi-

---

7. Like Title VII, the ADEA protects against adverse employment decisions. To state a cause of action, plaintiff has the burden of establishing a termination, a failure to hire, or some other action which negatively affects the terms and conditions of employment. Here plaintiff proceeded at trial as if a failure to consider is actionable. The Court is unaware of any such theory of recovery under the ADEA since it presumes a non-existent "duty to consider" fundamentally at odds with the at-will setting. Cf. section B below.

dence that the decision to consolidate and use existing staff was made by Chris Callero, Hal Arneson and Bill Williams. The decision to hire Jim Jackson was made by Bill Williams. There was no evidence at trial that any of these Bank employees harbored age-based animus or made any decisions during the process of consolidation because of any employee's age.

Defendant relies on a host of recent authority to bolster its claim that an employer is entitled to do what the Bank did here. *See Nidds v. Schindler Elevator Corp.*, 113 F.3d 912, 918 (9th Cir.1996) (holding on summary judgment motion that a reorganization which results in elimination of jobs and assignment of duties to others is a legitimate, nondiscriminatory reason for terminating plaintiff); *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 892 (9th Cir.1994) (affirming summary judgment in part on grounds that termination resulting from decision to decentralize function performed by plaintiff and to split job tasks between others is a legitimate, nondiscriminatory reason; holding that pretext is not shown merely by pointing out that the job functions are still being performed by other employees); *Rose v. Wells Fargo & Co.*, 902 F.2d 1417, 1422 (9th Cir.1990) (affirming summary judgment for employer in part on ground that jobs with duplicative functions may be eliminated during a merger or consolidation); *Simpson v. Midland–Ross Corp.*, 823 F.2d 937, 942 n. 6 (6th Cir.1987) ("When an employer reduces its work force for economic reasons, it incurs no duty to transfer the employee to another position within the company."); *see also Hazen Paper Co. v. Biggins*, 507 U.S. 604, 609–611, 113 S.Ct. 1701, 1705–07, 123 L.Ed.2d 338 (1993) (ADEA prohibits discrimination based on age, not other fac-

tors which may be correlated with age such as seniority, salary, pension status, etc.); *Barnes v. Southwest Forest Industries, Inc.*, 814 F.2d 607, 610 (11th Cir. 1987) (although employer could have terminated less senior employees on probationary status, "nothing in the ADEA requires that younger employees be fired so that employees in the protected age group can be hired"). Plaintiff attempted to establish pretext by a number of means at trial. The most persuasive claims will be considered below.[8]

### 1) The Bank knew the consolidation would have an adverse impact based on age

Repeatedly at trial plaintiff raised the specter of an adverse impact study conducted as a matter of course by the Bank on July 14, 1994, to examine the effect the RCA office closures would have on individuals protected by Title VII and the ADEA. Lucas Decl., Ex. M. The study found that the planned consolidation would have an adverse impact based on age since six out of the eight people whose jobs were eliminated in San Diego and Fremont were over 40. Plaintiff argued that the Bank did nothing in response to the adverse impact finding and that this raises an inference of discrimination.

As defendant correctly insists, however, no such inference may be drawn given the sample size of the study (twenty employees), and the fact that the percentage of employees in the two RCA's over 40 actually increased as a result of the consolidation. Sixteen out of twenty employees (80%) were over 40 before the consolidation, twelve out of the remaining fourteen (86%) were over 40 afterwards. *See Rose*, 902 F.2d at 1423 (no inference of discrimination where "the average age and mix of

---

**8.** There was other, even weaker, evidence offered to establish pretext which the Court will not consider in detail. For instance, plaintiff argued that the consolidation plan was a pretext because it was not documented. This claim is flatly contradicted by the record. *See* Gillette Decl., Ex. 19; *see also Chaffin v.*

*Textron, Inc.*, 861 F.Supp. 972, 978 (E.D.Cal. 1994) (no inference of discrimination arises from employer's lack of documentation for its employment decision) (citing *Merrick v. Farmers Ins. Group*, 892 F.2d 1434, 1438 (9th Cir.1990)).

employees prior to and after the consolidation were approximately the same. [Such] figures indicate a lack of age discrimination during the reorganization.").

### 2) Plaintiff was considered and then rejected for the Rancho Cordova position by Scott

Plaintiff also claims that she was considered by Jerry Scott for the position given to Jim Jackson. This argument is critical because, if true, it links the decision to hire Jim Jackson with the only Bank employee who made a comment implying age bias against plaintiff. At trial plaintiff testified that when she confronted Jerry Scott in late July about the selection of Jim Jackson, Scott said " 'I'm just surprised you are fighting this. Why don't you just retire and get a little job some place." ' Lucas Decl., Ex. A (Marques Trial Trans. 10/22/98 at 140). The difficulty is that, viewed in the light most favorable to plaintiff, the evidence supports only the conclusion that she and Jerry Scott *mistakenly* assumed that he had authority to select the senior credit administrator in Rancho Cordova. At trial Scott testified as follows:

Lucas: Were you actually the one who picked Jim Jackson?

Scott: I interviewed and selected him, yes?

Lucas: And you felt he was the best candidate over other candidates?

Scott: Yes.

Lucas: Did you interview—

Scott: He is the only person I interviewed. Again, in my opinion, he was the best candidate available.

Lucas: But you didn't interview anyone else; isn't that true?

Scott: That's correct.

Lucas: And did Bill Williams tell you that he wanted you to select Jim Jackson?

Scott: No.

Lucas Decl., Ex. D (Scott Trial Trans. 10/29/98 at 113). This testimony would seem to confirm plaintiff's theory. Indeed, it is the only testimony cited by plaintiff to support her theory. However, Bill Williams testified that he chose Jim Jackson early in July and simply arranged for Jerry Scott to meet with Jackson to discuss the transition to Bay Area Region work. Immediately following the above exchange, plaintiff's counsel inquired into the foundation for Scott's belief that he had authority to select Jim Jackson and Scott clarified both that he simply assumed he had this authority and that he was told the position would be filled from *existing* Rancho Cordova staff:

Lucas: Did you believe that it was your authority to be the person to select the candidate to fill that position that Jim Jackson filled?

Scott: Yes.

Lucas: And how did you learn that?

Scott: You asked me if I believed that. Yes, I did believe that.

Lucas: On what facts did you base that belief?

Scott: Well, there was an opening for a position there and there was a group of people that I guess throughout the Bank that I would, have to choose from. *Bill Williams indicated there were two individuals in Rancho Cordova that would be candidates for that.*

Lucas: And he told you that—it is your testimony that he told you that you would be the person to select the credit administrator who would fill that position?

Scott: I was certainly under the impression that I had the ability to hire and chose who I wish.

*Id.* at 113–14 (emphasis added).

██ The jury may have simply disbelieved Bill Williams' testimony that he selected Jim Jackson shortly after the June 28, 1994 meeting in Fremont and that he only asked Jerry Scott to meet with Jim Jackson. Perhaps the jury even concluded that Scott actually had authority to select the position under him in Rancho Cordova. But even if Scott had this authority, plaintiff offered nothing at trial to rebut the evidence that Williams, Callero and Arneson decided (before Scott even knew about the consolidation) that the position was to be filled from Dave Cristofani's existing staff in Rancho Cordova. *See* Gillette

Decl., Ex. 19, Ex. 3 (Williams Trial Trans. 11/5/98 at 18), Ex. 4 (Callero Trial Trans. 11/10/98 at 9), Ex. 5 (Arneson Depo. 5/27/98 at 41). Plaintiff also offered nothing to contradict Scott's testimony that Bill Williams informed him of this decision and nothing to show that she, or anyone else outside of Rancho Cordova, was ever considered for the job. In other words, even if the jury believed that Scott had decision-making authority, the authority would have extended only to the choice between Jim Jackson and Ron Jeffers, the two credit officers working in Rancho Cordova under Dave Cristofani.[9] That plaintiff and George Heiler were offered the grade 79 position in Rancho Cordova at the June 28 meeting further underscores that Williams and not Scott was making the decision about who would fill the new positions and that the senior level position in Rancho Cordova was never open to Fremont staff. *See* Lucas Decl., Ex. A (Marques Trial Trans. 10/22/94 at 140) (conceding that when she pressed Scott about the job given to Jim Jackson, Scott confirmed she would have to interview with Bill Williams). Since Scott was not a decision-maker, or at least could not have considered plaintiff (assuming the jury made the dubious conclusion that he had decision-making authority), no inference of discrimination arises as to the selection of Jim Jackson.

### 3) Plaintiff was replaced by a younger employee

Plaintiff insisted throughout the trial that her job was not eliminated. Instead, she argued that the work done in Fremont was simply transferred to Rancho Cordova and that she was "bumped" or "replaced" by Jim Jackson. In support of this claim she offered the testimony of RCA officers who survived the consolidation and confirmed that the Bay Area work was transferred to Rancho Cordova when the Fremont office closed. She also presented

company announcements stating that, although the office was moved, it kept the same mail code. According to plaintiff, the evidence that she was "bumped" by Jim Jackson, combined with the fact that he was younger, creates an inference of discrimination.

■ But the inference collapses at the first premise. The uncontradicted evidence at trial was that the job taken by Jim Jackson was a combination of the *consumer* lending done by plaintiff and the *commercial* lending done by George Heiler. No reasonable juror could conclude that plaintiff was replaced—her job was merged with another's and given to an employee deemed suitable for the combined tasks. *See Wallis*, 26 F.3d at 892 (pretext is not shown merely by pointing out that one's prior job functions are still being performed by other employees; "[Plaintiff's] response that other employees assumed his duties merely serves to reinforce [defendant's] explanation for his termination: the company was decentralizing [plaintiff's] function and downsizing by requiring other employees to assume his duties."). Indeed, as the discussion above reveals, there is no evidence that plaintiff was even considered for the new job.

### 4) Plaintiff was more qualified for Jim Jackson's job

■ Even if she wasn't actually replaced, plaintiff attempted to show at trial that she was more qualified than Jim Jackson for the job he took under Jerry Scott and that the selection of a younger, less qualified employee gives rise to an inference of discrimination. This was one of the most sharply contested areas at trial. However, the Court need not delve far to resolve the matter. Viewing the evidence in the light most favorable to the plaintiff, it is still impossible to conclude that she was better qualified than Jim Jackson. At

---

**9.** It is worth emphasizing here that plaintiff offered nothing to dispute the striking parallel between the staffing decisions and reorgani- zation resulting from the Fremont office closure and those made to implement the San Diego office closure.

best she was equally qualified. Although equally and possibly more experienced in some respects, plaintiff never had commercial lending authority above $250,000, and in her performance reviews Jerry Scott noted commercial lending experience as an area in which she needed to improve. Jim Jackson, on the other hand, had a commercial lending authority ($750,000), nearly equivalent to George Heiler's ($800,000), the person whose commercial lending review Jackson assumed. Although plaintiff presented evidence that commercial lending was only 15% of the Bay Area loan volume, she did not contest that this was part of the work transferred to Rancho Cordova and that the senior credit administrator under Jerry Scott there would have to handle this work. She also did not challenge evidence that commercial loans were more complex than consumer lending and that George Heiler handled the Bay Area districts with the most commercial loans. Absent evidence of some significant flaw in Jim Jackson's performance, or some deficit in his lending experience, no reasonable juror could have concluded that plaintiff was better qualified. She simply never had authority to review commercial loans at or anywhere near the level required for the Bay Area RCA.

## B. Failure to Select Plaintiff for Another Position With the Bank

The second employment decision plaintiff challenged as discriminatory was the Bank's failure to select her for another position with the Bank. The Bank argued that plaintiff did not actively search for other jobs or follow up leads. Even as to the two jobs for which she applied, defendant presented evidence that the hiring supervisors selected more qualified people. Plaintiff countered that the Bank undertook a duty to find her another job but failed to do so because it "considered her retired." In particular, plaintiff relied on Jerry Scott's retirement comment and two Bank documents that listed her as a retiree during the ETP period when she was still being paid to look for work.[10] Plaintiff also developed a fairly extensive record at trial that employees were often transferred or promoted by informal means in order to avoid termination when a restructuring occurred. She presented evidence that supervisors were often instrumental in helping their subordinates find other positions and that the Bank had an implicit policy of helping displaced employees find work within the Bank.

The key case here is *Rose v. Wells Fargo.* In *Rose,* Crocker Bank merged with Wells Fargo and a number of older Crocker employees lost their jobs when the banks finally consolidated their operations. Plaintiffs argued that an inference of discrimination arose "with respect to Wells Fargo's failure to interview or consider them for *other positions* within the reorganized bank." 902 F.2d at 1422 (emphasis added). Following the Sixth Circuit's holding in *Simpson,* the Ninth Circuit stated the following rule for determining whether there is discrimination in the failure to retain/reassign context:

> "When an employer reduces its work force for economic reasons, it incurs no duty to transfer the employee to another position within the company." *Simpson,* 823 F.2d at 942 n. 6. To the extent Wells Fargo voluntarily assumed such a duty by its actions and/or statements in the [Reduction–In–Force Manual], an inference of discrimination is raised where the terminated employee "can show that *others not in the protected class were treated more favorably.*" *Oxman v. WLS–TV,* 846 F.2d 448, 455 (7th Cir. 1988).

902 F.2d at 1422–23 (emphasis original). The court went on to note that plaintiffs failed to identify "a single younger employ-

---

**10.** The first document is a company newsletter, published September 12, 1994, listing plaintiff under the heading "Retirements." Gillette Decl., Ex. 22. The second document is a health plan "Open Enrollment Workbook," sent to plaintiff and listing her as retired as of August 1, 1994. Lucas Decl., Ex. L.

ee who was relocated after his Crocker job was eliminated. Moreover, the plaintiffs have not identified a specific job elsewhere in the consolidated bank which they claim they should have gotten instead of an employee outside the protected class." *Id.*

Here no reasonable juror could conclude that the Bank undertook to *give* plaintiff a job after the Fremont office closure. At the June 28, 1994 meeting, the Fremont staff was told that they would all have to find other work. The Bank emphasized at this meeting, and at plaintiff's exit interview on July 29, 1994, that despite the assistance being offered, there was no guarantee of finding a job. Plaintiff's ETP package reiterated the same admonition. Thus, viewed in the light most favorable to plaintiff, the evidence shows that the Bank undertook to *assist* plaintiff in finding other work ·(by paying her to look for work, offering outplacement services and providing access to the career opportunities program), subject to an explicit warning that its assistance was no guarantee of placement or reassignment within the Bank. The evidence also shows that the Bank did no more or less for plaintiff than it did for other similarly situated employees affected by the consolidation in Fremont and San Diego. In particular, there was no evidence that her co-worker George Heiler, who was substantially younger than plaintiff (thirteen years), received any assistance that she did not.

Turning to the specific jobs that arose after the Fremont office closure was announced, plaintiff does not dispute the evidence that, as to the two jobs for which she actually applied, more qualified individuals were selected and age was not a factor. Instead, plaintiff emphasizes that she would have gotten a job if Jerry Scott

and the Bank hadn't already considered her retired. The abstract proposition that "the Bank" would have done more if only it hadn't considered her retired fails for a number of reasons. First, the evidence is clear that the Bank made no promise to do more for plaintiff or anyone else following closure of the Fremont office. The evidence is equally clear that the Bank did no more for comparably situated younger employees in Fremont and Rancho Cordova than it did for plaintiff.

Second, the inference that the Bank actually considered her retired hinges on insufficient evidence. Plaintiff points only to the Bank documents referring to her as retired and the fact that Candy Jackson did not respond to the part of plaintiff's August 8, 1994 letter raising concerns about discrimination. As to the Bank documents, defendant offered uncontradicted testimony that mistakes occur in processing personnel information. In response, plaintiff failed to offer any evidence demonstrating that a hiring decisionmaker was responsible for or influenced by the documents' mistaken references to her employment status. Indeed, she did not even attempt to show that the references were anything but an error. Absent such evidence, the conclusion that the references were intentional and a reflection of the Bank's conclusion that plaintiff was retired (or should retire) is simply untenable. Even if the conclusion were tenable, and the jury simply disbelieved that the references were a mistake, there was no evidence linking a conclusion on the part of the Bank that plaintiff was retired to an adverse employment decision.[11]

Thus we are left with Jerry Scott and a job for which plaintiff did not formally apply. Plaintiff offered evidence at trial

---

11. Candy Jackson's failure to respond to plaintiff's concern that she was denied Jim Jackson's job because of her age, national origin, gender, or place of residence, is equally unenlightening. Jackson's August 9, 1994 letter replied by trying to clarify that the job in Rancho Cordova had been filled before plaintiff even inquired about it. Even assum-

ing that Jackson's failure to explicitly address the discrimination concerns reflected an age-based animus against plaintiff, there is, once again, no evidence of a resulting adverse employment decision connected to this animus. Moreover, plaintiff's letter raising the discrimination concerns explicitly requested Jackson to keep these concerns confidential.

that she spoke with Jerry Scott about a position in indirect auto lending because he knew the manager of the department. She testified that she asked Scott to look into the position and that he said he would. Lucas Decl., Ex. A (Marques Trial Trans. 10/22/98 at 204).[12] She also testified that he never followed up with her about the position and that she never pursued the lead, either though him or with the indirect lending department, because she assumed it would be fruitless. *Id.* at 204–205.[13] Assuming, as the Court must, that Jerry Scott did promise to look into the position for plaintiff, the question is whether the jury could have reasonably concluded (1) that plaintiff suffered an adverse employment decision as a result of Scott's failure to "look into" the position for plaintiff and (2) that age was a motivating factor for Scott's omission.

Defendant vigorously contends that plaintiff must have actually applied for the indirect lending position in order to state a prima facie case and that a general expression of interest does not constitute an application. Defendant also claims that Scott's retirement comment is a stray remark insufficient to support an inference of discriminatory animus. In her opposition papers, and at the trial, plaintiff repeatedly characterized this aspect of her case in the language of contract rather than in terms of intentional discrimination. *See* Plf's Opp. Mem. at 22 ("Marques reasonably relied, to her detriment, on the bank's representations that it would find her an open position . . . .").

■ According to well established case law, a plaintiff can state a prima facie case of discrimination in the failure to hire/re-hire/promote setting even if no formal application is submitted. Two theories apply. The first is that whether a plaintiff must have applied for a position depends on the hiring practices of the employer. If the employer's established practice is to hire for certain positions without requiring formal applications, then obviously plaintiff

12. Plaintiff testified as follows:

Marques: Yes, that was while I was still at my position in July of 1994. I knew that there was—just very briefly—the office that I sat in was a building, and within that building were other departments. There was another department called indirect auto loan department.

Lucas: And did you learn about a vacancy?

Marques: I knew that they were planning on moving either to Reno or to Las Vegas, in the future, and that there would be a position open as the line manager in that department.

Lucas: And did you express an interest in filling that position?

Marques: Yes, I did.

Lucas: And how did you express an interest in filling that position?

Marques: I asked Jerry Scott to look into that position for me.

Lucas: And why did you ask Jerry Scott to look into it for you?

Marques: Because Jerry Scott is my manager, and the overall manager of the indirect auto loan department was his colleague and friend from the Security Pacific, when they worked together at the Security Pacific Bank.

Lucas: And when you asked him to look into it for you, into the indirect auto loan position, what did he tell you?

Marques: He said he would do that.

13. Plaintiff testified:

Lucas: And did he ever follow up with you?

Marques: No, he didn't.

Lucas: Did anyone ever follow up with you with regard to the indirect loan position?

Marques: No, they did not.

Lucas: All right. Did you do anything to follow up on the indirect auto loan position?

Marques: By that time, I knew this was absolutely fruitless and that by asking my boss to intercede on my behalf on a position that was right next-door I relied on him, and there was no sense following up with anything else.

Lucas: And why did you rely on him?

Marques: Because he said he was going to discuss with the overall manager of that unit the position for me.

Lucas: And why did you not directly contact the head of the division?

Marques: Its not my place. I don't think that was my place to do that. I went to where I was supposed to go.

Lucas: And is that what you had done in the past?

Marques: That is exactly what I had done in the past.

need not have formally applied to state a claim, so long as she availed (or would have availed) herself of the employer's established process. As the Seventh Circuit explained in *Box v. A & P Tea Co.*:

> If A & P had a formal system of posting job openings and allowing employees to apply for them, Box's failure to apply for an assistant manager position would prevent her from establishing a prima facie case.... But A & P had no system to ensure that all interested employees could apply for a job. The plaintiff submitted evidence, which A & P apparently does not dispute, that A & P store managers promoted employees to assistant manager without asking for applications or posting the opening. *When an employer uses a promotion system in which employees do not apply for promotions but rather are sought out by managers, the application requirement of the prima facie case is loosened somewhat.* See *Reed v. Lockheed Aircraft Corp.,* 613 F.2d 757, 761 (9th Cir.1980); *Rodgers v. Peninsular Steel Co.,* 542 F.Supp. 1215, 1219–20 (N.D.Ohio 1982). In this situation, the plaintiff can establish the application element of a prima facie case by showing that, had she known of an assistant manager opening, she would have applied.

772 F.2d 1372, 1376–77 (7th Cir.1985) (emphasis added); *see also Wanger v. G.A. Gray Company,* 872 F.2d 142, 146 (6th Cir.1989) ("there are certain situations where less than a formal application is required" to establish that the employer was under an obligation to consider the plaintiff) (discussing other authority). The Ninth Circuit has also applied this rule of flexibility in establishing a prima facie case. In *Reed v. Lockheed,* defendant argued that plaintiff never personally applied for a training program or promotion. As the court responded:

> That begs the question for, if Reed is correct in her assertion that one did not apply for training or for promotion but instead had to be sought out and that

women found it futile in any event, it is immaterial that she was not rejected.... To establish a prima facie case of discrimination, Reed "need only show actions by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were based on a discriminatory criterion illegal under the Act."

613 F.2d 757, 761 (9th Cir.1980) (quoting *White v. City of San Diego,* 605 F.2d 455, 458 (9th Cir.1979)).

Nevertheless, courts have also held that a general expression of interest is insufficient to trigger any duty to consider on the part of the employer. *See Wanger,* 872 F.2d at 147 (employer had no obligation to consider employee for job opening two years after his termination where employee had inquired about future prospects and was told "there is a chance if they get busy again and things pick up your phone could ring"; holding that "employee failed to establish that he applied for the available position. With limited exceptions, *one cannot establish that he was subject to an adverse hiring decision unless he makes his desire for the position known to the employer.*") (emphasis added); *Williams v. Hevi–Duty Electric Company,* 819 F.2d 620, 629–30 (6th Cir.1987) (reversing district court's conclusion that plaintiff's "generalized expression of interest may be considered an application" where plaintiff, along with over 100 other county residents, had an application on file with defendant's local job services office stating that he wanted to work for defendant and no one else); *Box,* 772 F.2d at 1377 (plaintiff's request to store manager for training to "move up" and be promoted suggests nothing more than "a vague interest" in the positions at issue and is insufficient to prove that she would have applied for the positions at other stores if she had known of the openings).

■ The second theory is that, where discrimination is entrenched or pervasive and an application by a person in a protected category would be futile, a claim

may be stated even if no application was filed. *Int'l Brotherhood of Teamsters v. United States*, 431 U.S. 324, 366–67, 97 S.Ct. 1843, 1870–71, 52 L.Ed.2d 396 (1977) ("A consistently enforced discriminatory policy can surely deter job applications from those who are aware of it and are unwilling to subject themselves to the humiliation of explicit and certain rejection"; employee need not apply where discriminatory practices of employer "had been so successful as totally to deter job applications from members of minority groups"), *followed in,Reed*, 613 F.2d at 762 ("women at Lockheed had the legitimate belief that because of a pervasive discriminatory policy, an application would be futile"). Whether this theory applies where there is no evidence of *pervasive* discrimination is less clear.

Plaintiff combines both theories here, arguing first that, among management, the Bank frequently used networking and other informal methods of job placement, and second, that after she expressed interest to Jerry Scott, any further efforts to obtain the indirect lending job would have been futile. The evidence is clear that plaintiff did more than express a general interest in continued employment with the Bank. She inquired about a specific job and asked her manager for assistance making her interest and qualifications known to the hiring manager.[14] Moreover, plaintiff offered evidence that this was one of the informal mechanisms by which people in management obtained other jobs in the Bank. And unlike most of the "general interest" cases, plaintiff's manager apparently agreed to look into the job. However tenuous and informal, the jury may have properly concluded that this promise constituted an assurance that plaintiff would be considered for the indirect lending position.

Thus the only remaining question is whether there was sufficient evidence to conclude that plaintiff's age was a motivating factor in Scott's decision not to follow up on the indirect lending position. The answer to this question depends on whether, as a matter of law, Scott's retirement comment is a stray remark.

On a number of occasions, the Ninth Circuit has considered the stray remark doctrine in the context of age discrimination. The holdings of these decisions focus on four basic elements: (1) whether the comment is ambiguous as an indicator of discriminatory animus, (2) whether the comment is uttered by a decisionmaker (i.e., a person responsible for one of the adverse employment decisions at issue), (3) whether the comment is related in time and subject matter to the decisional process; and (4) whether there are multiple comments or only a single statement. *See Nidds*, 113 F.3d at 918–19 (comment by supervisor to another employee that he intended to get rid of all the "old timers" was a stray remark) (explicitly distinguishing *Schnidrig v. Columbia Mach., Inc.*, 80 F.3d 1406, 1411 (9th Cir. 1996) (not a stray remark where plaintiff was told three times upon asking to be considered for job that board of directors wanted somebody younger for the job)); *Nesbit v. Pepsico, Inc.*, 994 F.2d 703, 705 (9th Cir.1993) (comment by supervisor that "[w]e don't necessarily like grey hair" and comment by vice president of personnel that "[w]e don't want unpromotable fifty-year olds around" were stray remarks "uttered in an ambivalent manner ... not tied directly" to plaintiff's termination); *Merrick*, 892 F.2d at 1438–39 (hiring manager's comment to plaintiff that younger person was chosen because he was "a bright, intelligent, knowledgeable young man" is a stray remark) (citing other authority for proposition that stray remarks, particularly when isolated and made by non-decisionmakers or when unrelated to the decisional process, are insufficient to prove discrimination). *Compare EEOC v.*

14. The Court assumes, viewing the evidence in the light most favorable to plaintiff, that this was the import of her request that Scott "look into" the indirect lending position. In-deed, the import of the request is fairly obvious in light of Scott's knowledge that plaintiff needed to find another job within the Bank as a result of the Fremont office closure.

*Pape Lift, Inc.*, 115 F.3d 676, 679, 683–84 (9th Cir.1997) (new supervisor's comments to another supervisor that terminated employee "was old and burnt out [and] that he was hurting the store image ... because [he] did not fit the Pape mold of a young, aggressive type manager like they had in most other management positions," that "age was affecting [plaintiff's] memory and [that he] was too old to change," and that plaintiff was an "old geezer" and an "old fart" were "distinguished from what this court has previously viewed as stray remarks"); *Schnidrig*, 80 F.3d at 1411; *Mangold v. California Public Utilities Comm'n*, 67 F.3d 1470, 1476–77 (9th Cir.1995) (comments by senior decision-makers regarding promotions that "we want fresh young blood in this group," that "we're going into a bright new future in which have an excellent staff of young professional people ... and older employees, unfortunately don't take advantage of all the opportunities that are offered to them," and memorandum stating that defendant's "overall effort should be to keep as many of our younger, talented staff employed within the constraints of civil service rules" are not mere stray remarks).

Here, Scott's comment came in response to plaintiff's queries about the senior credit administrator position in Rancho Cordova. Although Scott's comment is arguably a stray remark with respect to this position since he was not a decisionmaker and since the statement came well after the evidence shows the position was filled, the same cannot be said with respect to the indirect lending job. First, Scott became a decisionmaker by promising to look into the job for plaintiff. Second, although his comment was linked to plaintiff's queries about the Rancho Cordova position, the substance of his comment indicates that he thought plaintiff had reached an age such that she should not care about getting *any*

new job with the Bank. Thus the comment powerfully suggests that Scott would be disinterested in assisting plaintiff in her efforts to find other work, including the indirect lending position, because he felt she should simply retire and get a little job someplace. Third, although the remark does not speak directly to plaintiff's age, the inference is hardly ambiguous. And contrary to defendant's suggestion, the remark is not simply a statement of fact (i.e., that plaintiff qualified for retirement).[15] Embedded in the remark is an implication that, given her age and retirement status, plaintiff should have known that she needn't bother seeking another job at the Bank. *See Pape Lift*, 115 F.3d at 684 (defendant "would have this court hold that discriminatory remarks are tied to the decisional process only if a decisionmaker said something to the effect of 'I'm firing you because you are too old.' Few employers who engage in illegal discrimination, however, express their discriminatory tendencies in such a direct fashion; indeed, we think that even those employers who claim to be ignorant of this nation's long struggle against various forms of employment bias would find a more subtle approach.").

■ The only ostensible defect the statement suffers is that it was not accompanied by other similar comments. The Court will not reverse the jury's verdict simply because Scott was not more open or repetitive in expressing the age bias he apparently held or developed toward plaintiff. Nor will the Court second guess the jury's conclusion as to the import of Scott's comment and its connection with his failure to follow up on the indirect lending position. Finally, although defendant lays great weight on the fact that Scott is the very person who, "just a year before the office closure ... [successfully] pressured senior management to award Plaintiff a vice president title ... along with a grade

---

**15.** Defendant contends that the statement "simply reflects the *effect* of [plaintiff's] termination: that Plaintiff was eligible to retire and could, if she wanted, obtain another job that would not require as much energy or time as

her credit administrator position. The simple statement of such a truism does not create liability for age discrimination." Def's Mem. at 16–17 (emphasis original).

promotion and salary increase," Def's Rply. Mem. at 9, the Court must assume that the jury weighed this evidence against his retirement comment and his failure to fulfill his promise regarding the indirect lending job. While Scott's earlier conduct toward plaintiff, and, incidentally, his membership in the protected class, may give rise to an inference that he held no age-based animus toward plaintiff, the jury was free to find that this inference was rebutted by Scott's conduct following Fremont office closure. In sum, at least as to the indirect lending position, defendant cannot sustain its burden for judgment as a matter of law.

### VI. CONCLUSION

Accordingly, and good cause appearing, defendant's renewed motion for judgment as a matter of law is HEREBY DENIED. The parties shall contact the court deputy to schedule briefing and a hearing date for plaintiff's attorney fees motion.

**IT IS SO ORDERED.**