Jessie L.W. BOWDEN, Plaintiff,

v.

John E. POTTER, Postmaster General, United States Postal Service, Defendant.

No. C–02–4280 EMC.

United States District Court, N.D. California.

March 12, 2004.

Michael D. Thomas, Esq., Nixon Peabody, LLP, San Francisco, CA, for Plaintiff.

Steven J. Saltiel, United States Attorney's Office, San Francisco, CA, for Defendant.

### ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Docket No. 53)

CHEN, United States Magistrate Judge.

Plaintiff Jessie L.W. Bowden sued his employer the United States Postal Service ("USPS") for race discrimination under Title VII. The USPS has moved for summary judgment, arguing that there is no evidence (1) that similarly situated employees outside of the protected class were treated more favorably and (2) that the USPS's stated reasons for its actions were a pretext for discrimination. Having reviewed the briefs, the accompanying evidentiary submissions, and the record in this case, and having considered the oral argument of counsel, the Court hereby DENIES the USPS's motion for summary judgment. There is a genuine dispute as to whether Mr. Bowden was removed from employment with the USPS because of his race.

### I. FACTUAL BACKGROUND

Mr. Bowden is African American. *See* Bowden Decl. ¶ 2. He has been a letter carrier for the USPS since 1982. *See* Bowden Decl. ¶ 1. During the relevant time period, Mr. Bowden worked at various offices and/or branches of the Palo Alto Post Office, including the Hamilton branch.

#### A. *Letter of Warning, Dated October 27, 1998*

On or about October 23, 1998, Mr. Bowden had a conversation with his supervisor David Gavino about the delivery of mail to a certain customer. According to Mr. Gavino, he instructed Mr. Bowden to deliver mail to the customer before going to lunch, but Mr. Bowden failed to do so. *See* Saltiel Decl., Ex. 3. According to Mr. Bowden, Mr. Gavino ordered him to deliver mail to the customer at the beginning of his route, which he did. *See* Bowden Depo. at 42:2–4, 59:9–10.

On October 27, 1998, Mr. Gavino issued Mr. Bowden a letter of warning for unsatisfactory performance/failure to follow instructions. *See* Saltiel Decl., Ex. 3, at 1.

#### B. *Notice of Suspension, Dated November 27, 1998*

On or about November 21, 1998, Mr. Bowden told Mr. Gavino that he was leaving work to see a doctor because fumes from a bathroom were affecting him. *See* Bowden Depo. at 74:9–11, 74:15–75:2, 75:4–20; Saltiel Decl., Ex. 4, at 1. According to Mr. Gavino, he stopped Mr. Bowden from going to see his doctor because there was a procedure that had to be followed. *See* Gavino Depo. at 100:20. According to Mr. Gavino, it was the Postmaster Mr. Sato's decision that anybody going to see a doctor had to fill out certain forms—*e.g.*, a CA–1 if there was a traumatic injury, a CA–2 and/or a CA–2A if there were injuries sustained because of a condition in the environment or a recurrence of a CA–1. *See* Gavino Depo at 100:20–25, 101:2–4, 101:7–11. Mr. Gavino called Mr. Sato (who was at home) and Mr. Sato said that, if Mr. Bowden was dizzy, then they could not let him drive or they would be held liable.[1] *See* Gavino Depo. at 100:20–22, 101:12–18. Mr. Gavino told Mr. Bowden that

I would make your appointment at the hospital of your choice and that I would

---

1. According to Mr. Gavino, he had to call Mr. Sato at home because Mr. Sato had a policy where, on weekends when he was not in the post office, he was to be notified at home when there was an accident. *See* Gavino Depo. at 102:15–19.

drive you there. You stated, "Oh no, you don't." I then reiterated the correct procedure and followed it with a direct order for you to be accompanied by me to the physician of your choice. You stated, "I'm not." You then left the workroom floor at 11:30 a.m. without authorization, and drove yourself to Kaiser Hospital to see a doctor.

Saltiel Decl., Ex. 4, at 1.

On November 27, 1998, Mr. Bowden was issued a notice of suspension (for seven calendar days) effective December 21, 1998, for unsatisfactory performance/failure to follow instructions. The notice was signed by Mr. Gavino and also by the Palo Alto Post Office Postmaster Masayuki Sato. *See* Saltiel Decl., Ex. 4, at 1.

C. *Notice of Proposed Removal, Dated December 23, 1998, and Letter of Decision, Dated January 6, 1999*

On or about November 27, 1998—the day that Mr. Bowden was issued the notice of suspension—Mr. Bowden needed to leave work to see a doctor once again. *See* Bowden Depo. at 76:2–8. According to a memo written by Mr. Gavino, he and Mr. Bowden walked to his desk at the Hamilton branch so that Mr. Bowden could fill out a form to go to a doctor's appointment. *See* Gavino Depo., Ex. D, at 1.

> As [Mr. Bowden] laid the [form] down on my desk he said "You know I know to get even." I asked him what that meant? and he said "You read Malco[l]m X's stuff didn't you?" And I said what's that supposed to mean? and he stated "I'll bust a cap in your fat ass." And he walked out. I gave no response. I was

shocked and I am concerned what Mr. Bowden may do.

> I took this threat serious because after he signed for the suspension he made the comment "I hope that I lose everything over this, my house my car cause I'm going to sue you and besides I could use some free time off." I responded with "It was my hope that we didn't have to get this far."

Gavino Depo., Ex. D, at 1. In the memo, Mr. Gavino also stated that he had filed a complaint with the Palo Alto Police Department about the threat. *See* Gavino Depo., Ex. D, at 1 (stating that he had talked to Officer Bob Wilkie and that the case number for the incident was 98–331–024).

In his declaration, Mr. Sato stated that he met with Mr. Gavino that day to talk about Mr. Bowden's threat.[2] *See* Sato Decl. ¶ 2; *see also* MSPB Tr. at 71:8–10, 16–17.[3] At the MSPB hearing, Mr. Sato said that he interviewed Mr. Gavino to make sure that the threat was serious and not in jest and that Mr. Gavino felt the threat was serious. *See* MSPB Tr. at 69:4–7. According to Mr. Sato, Mr. Gavino's words and body language convinced him that Mr. Gavino was being sincere. *See* MSPB Tr. at 69:18; *see also* Sato Decl. ¶ 2 ("I met with Mr. Gavino and determined that he was genuinely concerned for his safety."). Mr. Sato also said that there was nothing in Mr. Gavino's report that made him question the reliability of the report. *See* MSPB Tr. at 75:23. In addition, Mr. Sato stated that he never had any reason to doubt the truthfulness of anything Mr. Gavino told him and that he did not see any problems with Mr. Gavino as

---

2. Mr. Gavino could not remember whether he had a face-to-face interaction with Mr. Sato the day of the threat. *See* Gavino Depo. at 113:24.

3. Mr. Bowden appealed the USPS's action against him that resulted in a suspension for more than fourteen days to the Merit Systems Protection Board ("MSPB"). Mr. Bowden has submitted as an exhibit the transcript for the MSPB hearing. *See* Thomas Decl., Ex. D. As a general matter, the USPS has not objected to the admissibility of the transcript.

far as his interacting with his employees. *See* MSPB Tr. at 76:20, 24–25.

On December 23, 1998, Mr. Bowden was issued a notice of proposed removal for threatening a supervisor with bodily harm. *See* Sato Decl., Ex. 1. The notice, which was signed by Frank Canalez (the station manager for the Hamilton branch) as well as by Mr. Sato, stated in part:

> On Friday, November 27, 1998, you made comments to your supervisor, David Gavino which indicate that you may be injurious to yourself or to others.
>
> When I interviewed you on Friday, December 18, 1998, you stated, "That's not in my vernacular." You denied making such statements to Mr. Gavino.
>
> I find that your explanation does not justify your verbal threat to a supervisor.
>
> A policy statement, under the subject, Conduct and Discipline, dated March 2, 1993, which is marked "PERMANENT POSTING," and has been plainly displayed since it was issued, states that, "... all employees are required to maintain higher standards of conduct than most private sector employees. All employees are reminded that they are subject to disciplinary action, including removal, for ... Unacceptable personal behavior, including but limited to: ... Lewd/inappropriate language and/or behavior."
>
> Postal policy requires employees to avoid confrontations and not participate or encourage the continuation of arguments or controversies. The San Francisco District Policy on Conduct and Discipline dated November 14, 1995, prohibits employees from engaging in verbal or physical altercations with employees at any time. This policy places employees on notice that such conduct may result in discipline, up to and including removal. Therefore, based on

the above, your removal is issued for just cause.

Sato Decl., Ex. 1, at 1. The notice concluded by stating that Mr. Bowden had a right to reply within ten days and that any reply would be given consideration before a decision would be rendered by Mr. Sato. *See* Sato Decl., Ex. 1, at 2.

On January 6, 1999, Mr. Bowden was issued a letter of decision signed by Mr. Sato, which removed Mr. Bowden from employment at the USPS. *See* Sato Decl., Ex. 2. The letter noted that Mr. Bowden had not provided any reply to the notice of proposed removal. *See* Sato Decl., Ex. 2, at 1. Also, it cited in support of the decision to remove the 1993 and 1995 policy statements that had been cited in the notice of proposed removal. *See* Sato Decl., Ex. 2, at 1. The letter of decision did not cite—nor did the notice of proposed removal—a 1998 policy statement for the USPS San Francisco Performance Cluster titled "Zero Tolerance Policy Statement" regarding workplace violence. *See* Sato Decl., Ex. 3, at 1.

In his declaration, Mr. Sato stated that he did not recall talking with any other individual besides Mr. Gavino before issuing his decision letter to remove Mr. Bowden. *See* MSPB Tr. at 69:21; *see also* Bowden Decl. ¶ 4 ("I never spoke with Postmaster Masayuki Sato regarding the investigation of the alleged incident of November 28, 1998, in which Mr. Gavino alleged that I threatened him with bodily harm."). Mr. Sato also stated that it was normal procedure to call the Postal Inspectors in a situation such as the one involving Mr. Bowden and that the Postal Inspectors may have been called but he did not recall. *See* MSPB Tr. at 73:1, 6–7.

#### D. *Discriminatory Remarks by Mr. Gavino*

According to Mr. Bowden, Mr. Gavino called him a "nigger" on three different

occasions. On each of those occasions, only Mr. Bowden and Mr. Gavino were present. *See* Bowden Depo. at 39:12–13.

First, Mr. Bowden stated that, in 1993, he and Mr. Gavino were discussing grievances in a conference room. *See* Bowden Depo. at 37:20–23, 37:25–38:1. (Mr. Bowden was a shop steward and Mr. Gavino was a Step 1 designee. *See* Gavino Depo. at 59:15–19 ("If he was representing a fellow carrier and there was a grievance he and I would meet at [S]tep 1 and we would resolve it or agree to disagree and pass it on.").) Mr. Gavino "was trying to convince [Mr. Bowden] to agree and kind of like shade the—the contract"; because Mr. Bowden would not, Mr. Gavino became upset. Bowden Depo. at 46:20–22, 25. Mr. Gavino then said to Mr. Bowden, "I'm going to get you, 'nigger.'" Bowden Depo. at 47:3–4.

Second, it appears that Mr. Gavino next called Mr. Bowden a "nigger" during the incident in October 1998 that resulted in Mr. Gavino issuing a letter of warning to Mr. Bowden. *See* Part I.A, *supra; see also* Bowden Depo. at 38:8–15, 41:23–42:25. According to Mr. Bowden, he and Mr. Gavino had a dispute about the delivery of mail to a customer. *See* Bowden Depo. at 52:18–53:10. Mr. Gavino said to Mr. Bowden about eight or nine times, "I'm giving you a direct order to do it [*i.e.,* deliver the customer's mail]," and then Mr. Gavino finally said, "I'm going to get you, 'nigger.'" Bowden Depo. at 53:13–17.

Finally, Mr. Bowden stated that the third time that Mr. Gavino called him a "nigger" was in November 1998. It is not entirely clear whether this incident took place on November 21, 1998, the day that Mr. Bowden allegedly failed to follow instructions, resulting in the suspension, or November 27, 1998, the day that Mr. Bowden received the suspension and allegedly threatened Mr. Gavino, resulting in the removal. *See* Bowden Depo. at 38:19–21,

54:23–55:25, 56:2–3. According to Mr. Bowden, he told Mr. Gavino that he was going to see the doctor, but Mr. Gavino told him that he could not leave the workroom floor. *See* Bowden Dep. at 55:15–25. During this discussion, Mr. Gavino said to Mr. Bowden, "I'm going to get you, 'nigger.'" Bowden Depo. at 56:9–10.

In addition to the above discriminatory remarks, Mr. Bowden asserts that Mr. Gavino made other race-based comments. For example, at some point, Mr. Gavino said to Mr. Bowden that Mr. Bowden was not "walking fast enough, and that [he] was walking like [he] was hanging on the corner of East Palo Alto." Bowden Depo. at 35:22–25.

At his deposition, Mr. Gavino testified that he did not remember whether he ever used the word "nigger" with Mr. Bowden and that he did not recall a specific instance of using the term at work. *See* Gavino Depo. at 74:20, 75:21. However, Mr. Gavino later added that there was a period of time when the phrase "Nigger, please," was common at the work site. *See* Gavino Depo. at 77:6–11.

## II. *DISCUSSION*

### A. *Standard of Review*

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be rendered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue of fact is genuine only if there is sufficient evidence for a reasonable jury to find for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248–49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "The mere existence of a scintilla of evidence ... will be insufficient; there must be evidence on which the jury could reason-

ably find for the [nonmoving party]." *Id.* at 252, 106 S.Ct. 2505. At the summary judgment stage, evidence must be viewed in the light most favorable to the nonmoving party and all justifiable inferences are to be drawn in the nonmovant's favor. *See id.* at 255, 106 S.Ct. 2505.

## B. *Prima Facie Case*

In order to prevail in a Title VII case against his or her employer, the plaintiff must establish a prima facie case of discrimination. *See Vasquez v. County of Los Angeles,* 349 F.3d 634, 640 (9th Cir.2003). If the plaintiff successfully establishes a prima facie case, then the burden shifts to the employer to provide a legitimate, nondiscriminatory reason for its allegedly discriminatory conduct. *See id.* If the employer does so, then the burden shifts back to the plaintiff to show that the employer's reason is a pretext for discrimination. *See id.*

For a prima facie case, a plaintiff must offer evidence that gives rise to an inference of unlawful discrimination "either through the framework set forth in *McDonnell Douglas v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), or with direct or circumstantial evidence of discriminatory intent." *Vasquez,* 349 F.3d at 640; *see also McDonnell Douglas,* 411 U.S. at 802 n. 13, 93 S.Ct. 1817 (noting that

the facts necessary to establish a prima facie case will vary in Title VII cases); *cf. Furnco Constr. Corp. v. Waters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978) ("The method suggested in *McDonnell Douglas* . . . was never intended to be rigid, mechanized, or ritualistic."). In *McDonnell Douglas,* in which there was alleged a discriminatory failure to hire, the Supreme Court held that the plaintiff could establish a prima facie case of discrimination by showing

> (i) that he belongs to a racial minority [*i.e.,* a protected class]; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

*Id.* at 802, 93 S.Ct. 1817.

The USPS argues that it should be granted summary judgment because, even if Mr. Bowden can establish the first three prongs of the *McDonnell Douglas* prima facie test, he cannot satisfy the fourth— *i.e.,* "that similarly situated employees outside of his protected group were treated more favorably." Mot. at 6 (citing *Chuang v. University of Cal. Davis, Board of Trustees,* 225 F.3d 1115 (9th Cir.2000)[4]).

---

4. The Court notes that, in *Chuang,* the Ninth Circuit did frame the fourth prong as "similarly situated individuals outside his protected class were treated more favorably." *Chuang,* 225 F.3d at 1123 (adverse employment actions included failure and refusal to grant promised tenure position and forcible relocation of plaintiff's lab). The Court also notes that the Ninth Circuit, in other cases, has characterized the fourth prong in the same way. However, the Ninth Circuit has also framed the fourth prong without requiring the person similarly situated to be outside the protected class. For example, in *Godwin v. Hunt Wesson, Inc.,* 150 F.3d 1217 (9th Cir. 1998), the Ninth Circuit described the prima

facie test as follows: "(1) [S]he belongs to a protected class, (2) she was performing according to her employer's legitimate expectations, (3) she suffered an adverse employment action, and (4) other employees with qualifications similar to her own were treated more favorably." *Id.* at 1220 (adverse employment action consisted of failure to promote); *see also Vasquez,* 349 F.3d at 640 n. 5 (adverse employment actions consisted of transfer to a field position and issuance of warning letter; characterizing fourth prong in same way as in *Godwin*); *Pejic v. Hughes,* 840 F.2d 667 (9th Cir.1988) (adverse employment action consisted of discharge; stating that fourth prong was that "employer sought a replacement

According to the USPS, a similarly situated employee is one who has a similar job, displays similar conduct, has the same supervisor, and is subject to the same standards. *See* Mot. at 6. In support of this argument, the USPS relies primarily on *Vasquez,* in which the Ninth Circuit stated, *inter alia,* that "individuals are similarly situated when they have similar

with qualifications similar to his own, thus demonstrating a continued need for the same services and skills"); *Sengupta v. Morrison–Knudsen Co., Inc.,* 804 F.2d 1072, 1075 (9th Cir.1986) (same).

The Ninth Circuit has not reconciled this conflict regarding the fourth prong. However, at this juncture of the case, the Court need not address the issue because Mr. Bowden has offered at least one plausibly similarly situated person who *is* outside his protected class. *See* Part II.B.2, *infra.*

The Court notes, however, that, in *McDonnell Douglas,* the Supreme Court did not expressly require a similarly situated person be outside the protected class. *See McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817 (in failure-to-hire situation, stating that fourth prong was, "after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications"); *see also Lyons v. England,* 307 F.3d 1092, 1116 (9th Cir.2002) (in failure-to-promote case, stating that "proof that the employer filled the sought position with a person not of the plaintiff's protected class is neither a sufficient nor a necessary condition of proving a Title VII case, and it is not prescribed by the Supreme Court's original statement of the prima facie case.") (internal quotation marks omitted); *Diaz v. AT & T,* 752 F.2d 1356, 1359, 1361 (9th Cir.1985) (in failure-to-promote case, reversing district court's holding that fourth prong could not be met unless challenged position was filled by someone outside the protected class).

In *Perry v. Woodward,* 199 F.3d 1126 (10th Cir.1999), the Tenth Circuit explained why a comparison outside of the protected class should not be necessary, even when the situation is a termination rather than a failure to hire or promote.

> When viewed against the backdrop of historical workplace discrimination, an employee who belongs to a racial minority and who eliminates the two most common, legitimate reasons for termination, *i.e.,* lack of qualification or the elimination of the job, has at least raised an inference that the termination was based on a consideration of impermissible factors. The firing of a qualified minority employee raises the inference of discrimination because it is facially illogical to randomly fire an otherwise qualified employee and thereby incur the considerable expense and loss of productivity associated with hiring and training a replacement.

*Id.* at 1140.

The court further explained there are compelling reasons why a comparison to a person outside the protected class should not be required:

> The imposition of the inflexible rule advocated by Defendants [*i.e.,* that the terminated plaintiff must be replaced by someone outside the protected class] is untenable because it could result in the dismissal of meritorious claims. Defendant's rule would preclude suits against employers who replace a terminated employee with an individual who shares her protected attribute only in an attempt to avert a lawsuit. It would preclude suits by employers who hire and fire minority employees in an attempt to prevent them from vesting in employment benefits or developing a track record to qualify for promotion. It would also preclude a suit against an employer who terminates a woman it negatively perceives as a "feminist" and replaces her with a woman who is willing to be subordinate to her male co-workers or replaces an African–American with an African–American who is perceived to "know his place." Although each of these situations involves wrongfully-motivated terminations, under the rule advocated by the Defendants, the terminated employee would be unable to meet the prima facie burden. Such a result is unacceptable.

*Perry,* 199 F.3d at 1137; *cf. Conward v. Cambridge Sch. Committee,* 171 F.3d 12, 19 (1st Cir.1999) (in discriminatory discharge case, agreeing with plaintiff that "the time to consider comparative evidence in a disparate treatment case is at the third step of the burden-shifting ritual" [*i.e.,* pretext]—*i.e.,* "after the plaintiff has put forward the standard prima facie case").

jobs and display similar conduct." *Vasquez,* 349 F.3d at 641.

In response, Mr. Bowden argues that the USPS's definition of "similarly situated" is overly restrictive. According to Mr. Bowden, the question is whether an employee is similarly situated " 'in all material respects.' " Opp'n at 6. In support of this argument, Mr. Bowden relies primarily on *McGuinness v. Lincoln Hall,* 263 F.3d 49 (2d Cir.2001), a case in which the Second Circuit expressly rejected the lower court's conclusion that an employee cannot be similarly situated "unless the other employee had the same supervisor, worked under the same standards, and engaged in the same conduct." *Id.* at 53; *see also Graham v. Long Island R.R.,* 230 F.3d 34, 41 (2d Cir.2000) ("What constitutes 'all material respects' . . . varies somewhat from case to case. . . ."). Mr. Bowden then asserts that there are at least four similarly situated persons outside his protected class who were treated more favorably than he: (1) Russell Albo; (2) Dan Maseuda; (3) Margaret Foster; and (4) Mr. Gavino.

### 1. *Law on "Similarly Situated"*

Given the parties' divergent views, the Court must address first what "similarly situated" means in the context of Title VII law. The most recent Ninth Circuit opinion that sheds light on the meaning of the phrase is *Vasquez.*

In *Vasquez,* the plaintiff was a probation officer who worked for the County of Los Angeles at a detention facility for youths who have committed less serious crimes. *See Vasquez,* 349 F.3d at 638. The director of the facility transferred the plaintiff to a field position and issued a letter of warning after another probation officer claimed that, while she was acting director for the facility, the plaintiff disobeyed one of her orders—more specifically, her order that his charges not play football. *See id.*

at 639, 642. This probation officer was someone with whom the plaintiff had previously had conflict; moreover, this probation officer had previously made racially discriminatory remarks toward the plaintiff. *See id.* at 638. The plaintiff claimed that he suffered the above adverse employment actions as a result of race discrimination.

The district court granted summary judgment to the County, which the plaintiff then appealed. On appeal, the Ninth Circuit held that, even if the plaintiff could make out a prima facie case under *McDonnell Douglas,* the plaintiff could not establish that the County's articulated nondiscriminatory reason for the adverse employment action was pretextual. *See id.* at 641. The Ninth Circuit conceded that "[a] showing that the County treated similarly situated employees outside [the plaintiff's] protected class more favorably would be probative of pretext." *Id.* However, it rejected the plaintiff's argument that two particular employees cited by the plaintiff were similarly situated. It stated: "[I]ndividuals are similarly situated when they have similar jobs and display similar conduct." *Id.* One employee was not similarly situated to the plaintiff because she was not involved in the same type of offense; also, she was a supervisor with much greater responsibility, and "[e]mployees in supervisory positions are generally deemed not to be similarly situated to lower level employees." *Id.* The other employee was not similarly situated because, even though he held the same level position as the plaintiff, he "did not engage in problematic conduct of comparable seriousness to that of [the plaintiff]." *Id.* While both the plaintiff and the other employee allowed their charges to play football, the other employee did not know that there had been a direct order from the probation officer (serving as acting director of the facility) that the youths were

not allowed to play football. *See id.* at 641–42.

The USPS advocates a narrow view of the "similarly situated" element based on the *Vasquez* court's statement that "individuals are similarly situated when they have similar jobs and display similar conduct," *id.* at 641, and the *Vasquez* court's citation to the Sixth Circuit decision *Hollins v. Atlantic Co., Inc.,* 188 F.3d 652 (6th Cir.1999), which held that, "to be similarly situated, an employee must have the same supervisor, be subject to the same standards, and have engaged in the same conduct." *Vasquez,* 349 F.3d at 642 n. 17. However, the *Vasquez* court cited *Hollins* merely to support its finding that an employee was not similarly situated to the plaintiff because he had not "engage[d] in problematic conduct of comparable seriousness." *Id.* at 641. And although the *Vasquez* court stated that "[e]mployees in supervisory positions are *generally* deemed not to be similarly situated to lower level employees," *id.* (emphasis added), it did not hold that this is universally the case.

Indeed, in another recent opinion, *Aragon v. Republic Silver State Disposal, Inc.,* 292 F.3d 654 (9th Cir.2002), the Ninth Circuit cited approvingly the Second Circuit's *McGuinness* opinion as "explaining [the] minimal showing necessary to establish co-workers were similarly situated." *Id.* at 660. In *McGuinness,* the Second Circuit expressly rejected the district court's conclusion on summary judgment that "another employee cannot be similarly situated to a plaintiff unless the other employee had the same supervisor, worked under the same standards, and engaged in the same conduct." *McGuinness,* 263 F.3d at 53. The court emphasized that an employee "must be similarly situated in all *material* respects—not in *all* respects." *Id.* (emphasis in original). It further explained that,

where a plaintiff seeks to establish the minimal prima facie case by making reference to the disparate treatment of other employees, those employees must have a situation sufficiently similar to plaintiff's to support at least a minimal inference that the difference of treatment may be attributable to discrimination.

*Id.* at 54. Other cases are in accord. *See, e.g., Patterson v. Avery Dennison Corp.,* 281 F.3d 676, 680 (7th Cir.2002) (stating that, in determining whether an employee is similarly situated, a " 'court must look at all relevant factors, the number of which depends on the context of the case' "); *Conward,* 171 F.3d at 20 (stating that "[r]easonableness is the touchstone: while the plaintiff's case and the comparison cases that he advances need not be perfect replicas, they must closely resemble one another in respect to relevant facts and circumstances"); *Ercegovich v. Goodyear Tire & Rubber Co.,* 154 F.3d 344, 352 (6th Cir.1998) (stating that "[t]he plaintiff need not demonstrate an exact correlation with the employee receiving more favorable treatment in order for the two to be considered similarly-situated; rather, ... the plaintiff and the employee with whom the plaintiff seeks to compare himself or herself must be similar in all of the relevant aspects") (internal quotation marks omitted); *see also Bennun v. Rutgers State University,* 941 F.2d 154, 177–78 (3d Cir. 1991) (holding that, even if one employee was "teaching-oriented" professor and plaintiff was "research-oriented professor, a comparison between the two can be made to determine if [the college's] five objective criteria for advancement to full professor were evenly applied"—even if composition of some of reviewing committees may have been different); *Mulugeta v. Regents of Univ. of Cal.,* No. C–01–0332 EDL, 2002 U.S. Dist. LEXIS 17013, at *44 (N.D.Cal. July 22, 2002) (stating that, even

though "Employees A and B were disciplined by different decisionmakers," that "does not necessarily preclude them from being similarly situated to [the plaintiff]"); *Petsch–Schmid v. Boston Edison Co.,* 914 F.Supp. 697, 705 n. 17 (D.Mass.1996) (stating that requirement of same supervisor not applicable "particularly where a company has instituted company-wide standards of discipline . . . intended to provide guidance to all company supervisors").[5]

■ The Court concludes that similarly situated does not require that the employees be *identically* situated. The employees need not necessarily have the same supervisor, be subject to the same standards, and engage in the same conduct. The relevance of such factors depends on the circumstances and nature of the case. The critical question is whether the plaintiff and the other employee are similarly situated in "all *material* aspects." *McGuinness,* 263 F.3d at 53 (emphasis in original). For instance, an employee on an assembly line who physically assaults a co-worker is similarly situated to a supervisor who engages in similar conduct. A worker in the sales department who steals company property is similarly situated to one who works in customer service and commits the same act. The ultimate question that is informed by the similarly situated analysis is whether there is a basis for inferring discriminatory motive: Does the purported purpose of the challenged action require similar treatment of the two employees or does it justify different treatment due to differences in their status or situation rather than race? In the above

examples, the fact that one employee is a supervisor or works in a different department is irrelevant to the purpose of the discipline. In other situations, those differences may be relevant. The issue of similarly situated status is therefore fact specific and defies a mechanical or formulaic approach. This is particularly so in view of the overarching predicate as to the relevance of the *McDonnell Douglas* test in the first place; as noted above, it is merely one method by which an inference of unlawful discrimination may be raised. *See Vasquez,* 349 F.3d at 640.

### 2. Employee(s) Similarly Situated to Mr. Bowden

The Court turns now to the question of whether a reasonable jury could find that the persons identified by Mr. Bowden were similarly situated in "all material aspects." The Court first notes that not only must all inferences be drawn in Mr. Bowden's favor but also that the question of similarly situated is generally an issue of fact. *See Mandell v. County of Suffolk,* 316 F.3d 368, 379 (2d Cir.2003) (stating that the question of whether an employee is similarly situated to the plaintiff is ordinarily a question of fact for the jury); *Graham,* 230 F.3d at 39 (same); *see also Gifford v. Atchison, T. & S.F.R. Co.,* 685 F.2d 1149, 1156 (9th Cir.1982) (concluding that EEOC report, which stated that there was reasonable cause to believe that plaintiff had been treated differently from similarly situated male employees, "was sufficient to create an issue of fact on this

---

**5.** Furthermore, it should be noted that *Vasquez* was addressing the similarly situated element in the context of the pretext analysis, not the first prong of *McDonnell Douglas* which addresses whether the plaintiff has established a prima facie case. Given the gatekeeping function of the first prong, there is reason to apply a more relaxed analysis to the prima facie stage than to the pretext state.

*See, e.g., Simpson v. Kay Jewelers,* 142 F.3d 639, 646 (3d Cir.1998) (stating that comparison to one other similarly situated person outside the protected class may suffice at prima facie stage but not necessarily at pretext stage "where the factual inquiry into the alleged discriminatory motives of the employer has risen to a new level of specificity").

question"). Mr. Bowden asserts that there are four similarly situated persons who were treated more favorably than he: (1) Mr. Albo (Caucasian), (2) Mr. Maseuda (Asian), (3) Ms. Foster (Caucasian), and (4) Mr. Gavino (Native American).

 Regarding Mr. Albo, based on the record, it appears that he—as in the case of the allegation against Mr. Bowden— made a threat of violence at the Hamilton branch but that he—unlike Mr. Bowden— was not fired but only suspended. On or about January 22, 1993, Mr. Albo publicly stated at the Hamilton branch, "I'm going to get a shotgun and kill you all," and "Since I don't know who did it, everyone's going to get blown away." Thomas Decl., Ex. H at 1 (request for medical evaluation for Mr. Albo signed by John W. Kelly, Superintendent of Support, and Mr. Sato, Postmaster). The next day, Mr. Albo was placed on emergency off-duty status by Charlene Jurian, a supervisor at the Hamilton branch. *See* Thomas Decl., Ex. G. On January 26, 2003, a request for a medical evaluation was made by John Kelly, Superintendent of Support, and Mr. Sato, Postmaster. *See* Thomas Decl., Ex. H. According to the declaration of Mr. Kelly, on February 5, 2003, he notified Mr. Albo that the letter placing him on emergency off-duty status was rescinded, and Mr. Albo was placed on sick leave pending medical evaluation. *See* Kelly Decl. ¶ 2. After the evaluation showed that Mr. Albo was fit for duty and did not present a safety hazard, Mr. Kelly issued Mr. Albo a fourteen-day suspension. *See* Kelly Decl. ¶ 2.

The USPS argues that Mr. Albo is not similarly situated to Mr. Bowden because, (1) unlike Mr. Bowden, Mr. Albo made a vague threat to the workplace as a whole without identifying a specific target; (2) Mr. Albo was disciplined by a supervisor different from the one who had disciplined Mr. Bowden; (3) unlike Mr. Bowden, Mr. Albo did not have a history of discipline [6]; and (4) the 1998 zero tolerance policy was not in effect at the time that Mr. Albo made his threat but was in effect at the time that Mr. Bowden made his. These distinctions, however, do not preclude a reasonable jury from finding that Mr. Albo was similarly situated to Mr. Bowden.

First, the fact that Mr. Albo threatened the entire workplace could be viewed as equally or even more serious conduct rather than less serious. Indeed, while Mr. Bowden's alleged threat was capable of being interpreted as figurative or rhetorical,[7] Mr. Albo's words unequivocally threatened violence. Second, while the immediate supervisor was different in Mr. Albo's situation, the same Postmaster— *i.e.*, Mr. Sato—was involved in each. (As noted above, Mr. Sato co-signed the request for a medical evaluation for Mr. Albo, and the request explicitly discussed the threat that had been made.) Furthermore, as stated by the district court in *Petsch–Schmid*, "to require an employee to compare herself only with other employees disciplined by the same supervisor" is not reasonable "particularly where a company has instituted company-wide standards of discipline . . . intended to provide guidance to all company supervisors." *Petsch–Schmid*, 914 F.Supp. at 705 n. 17; *cf. Graham v*, 230 F.3d at 40, 42 (noting that, to satisfy the "all material respects"

---

**6.** According to Mr. Kelly, at the time of the incident, Mr. Albo did not have any previous disciplinary history on record. *See* Kelly Decl. ¶ 2.

**7.** After Mr. Bowden is alleged to have threatened to "bust a cap in [Mr. Gavino's] fat ass,"

Mr. Bowden then purportedly stated, "I hope that I lose everything over this, my house my car cause I'm going to sue you and besides I could use some free time off." These comments could be interpreted as indicating Mr. Bowden's real intent was to sue, not shoot, Mr. Gavino.

standard for being similarly situated, plaintiff must show that her co-employees were subject to same performance evaluation and discipline standards). In the instant case, there is evidence that there were company-wide standards of discipline in place. Third, while Mr. Bowden did have a history of other misconduct, the notice of proposed removal and letter of decision regarding removal did not expressly take into account that prior misconduct. Moreover, that discipline was recent and did not involve any violence. Fourth, even though the 1998 zero tolerance policy was in effect at the time of Mr. Bowden's alleged threat and not at the time of Mr. Albo's, the notice of proposed removal and letter of decision sent to Mr. Bowden did not mention this policy as the basis for the removal. Rather, these documents cited policies from 1993 and 1995. At the time that Mr. Albo was suspended, the 1993 policy cited in Mr. Bowden's disciplinary papers appears to have been in effect. *See* Sato Decl., Ex. 1 (noting that 1993 policy was dated March 2, 1993); Kelly Decl., Ex. 1 (notice of suspension issued to Mr. Albo, dated March 11, 1993). In other words, it appears that Mr. Bowden and Mr. Albo were both subject to the 1993 policy, or at least that inference could reasonably be drawn.

Based on the above, the Court concludes that a reasonable jury drawing the inferences in Mr. Bowden's favor could find that Mr. Albo was similarly situated to Mr. Bowden in "all material aspects" pertinent to the imposition of discipline. Consequently, the Court rejects the first basis for the USPS's summary judgment motion and moves on to the USPS's next argument regarding evidence of pretext.[8]

## C. *Pretext*

The USPS argues that, even if there is a genuine dispute as to the prima face case, there is no evidence that its stated reason for terminating Mr. Bowden—*i.e.,* that he threatened Mr. Gavino—was a pretext for discrimination. In evaluating whether an employer's articulated reason is pretextual, a court should consider, at a minimum, the same evidence that the plaintiff introduced to establish his prima facie case. "When that evidence, direct or circumstantial, consists of more than the [prima facie] presumption, a factual question will almost always exist with respect to any claim of nondiscriminatory reason." *Wallis v. J.R. Simplot Co.,* 26 F.3d 885, 890 (9th Cir. 1994); *see also Coleman v. Quaker Oats Co.,* 232 F.3d 1271, 1282 (9th Cir.2000) (stating plaintiff may rely on same evidence used to establish a prima facie case or put forth additional evidence).

The Supreme Court has held that a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated. *See Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 148, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). A plaintiff may discredit an employer's proffered reason by demonstrating such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reason for its action that a reasonable factfinder could rationally find that reason unworthy of credence. *See Fuentes v. Perskie,* 32 F.3d 759, 765 (3d Cir.1994). In addition, a plaintiff may demonstrate pretext by

8. Because there is a genuine dispute as to whether Mr. Albo is a similarly situated employee, the Court need not resolve whether the other persons identified by Mr. Bowden (*i.e.,* Mr. Maseuda, Ms. Foster, and Mr. Gavino) are also similarly situated. The Court notes, however, that Plaintiff's arguments as to these individuals appear problematic, and the Court may address the admissibility of the facts as to each of these employees in pretrial rulings.

showing that the employer treated similarly situated employees outside the plaintiff's protected class more favorably. *See Vasquez*, 349 F.3d at 641.

■ In the instant case, the Court concludes that there is sufficient evidence from which a reasonable jury could find the USPS's stated reason for terminating Mr. Bowden pretextual. That evidence includes the following: (1) the more favorable treatment of Mr. Albo, who is Caucasian; (2) Mr. Sato's claim in his declaration that he removed Mr. Bowden because his conduct violated the 1998 zero tolerance policy, even though Mr. Sato did not refer to that policy as a reason for his decision at the MSPB hearing in 2001 nor in his letter of decision regarding the removal in 1998; (3) Mr. Sato's failure to contact Mr. Bowden about the alleged threat, despite the fact that he had personally heard Mr. Gavino's version of the events and Mr. Bowden had been a USPS employee for almost twenty years [9]; (4) Mr. Sato's failure to take immediate steps to protect Mr. Gavino and/or other USPS employees even though he said he believed, based on Mr. Gavino's words and body language, that the threat was serious and not in jest [10]; and (5) Mr. Gavino's various discriminatory remarks. This evidence, even if separately insufficient, taken cumulatively is sufficiently specific and substantial to create a triable issue of fact regarding pretext. *See Godwin*, 150 F.3d at 1221–22 (stating that, when the evidence of discriminatory motive is circumstantial, the evidence must be specific and substantial in order to create a triable issue).

The USPS contends, however, that none of the discriminatory remarks allegedly made by Mr. Gavino can be considered by the Court because Mr. Bowden's deposition testimony about the remarks is "sham" testimony designed solely to avoid summary judgment. The USPS points out that Mr. Bowden never mentioned any of the discriminatory remarks during the MSPB hearing or in his EEO affidavits. In response, Mr. Bowden asserts that he did not mention the remarks at the MSPB hearing because he "was not given an adequate opportunity to identify the exact comments made by [Mr. Gavino]." Bowden Decl. ¶ 5. He also claims that he did not provide details about the remarks in his EEO complaint and request for counseling "because of [his] lack of faith in the EEO complaint process." Bowden Decl. ¶ 5.

The Court notes that the credibility of Mr. Bowden's declaration is suspect given that (1) Mr. Bowden represented himself at the MSPB hearing and was allowed to give a narrative of his version of the events; (2) the ALJ at the MSPB hearing seemed to give Mr. Bowden every opportunity to relate his version of the events, even conducting independent questioning of Mr. Bowden and asking Mr. Bowden directly, "[W]hat [racially derogatory statements] did you hear [Mr. Gavino]

---

9. The Court acknowledges that Mr. Bowden was informed that he had ten days to reply to the notice of proposed removal, *see* Sato Decl., Ex. 1, at 2, but that Mr. Bowden did not provide a written response. *See* Sato Decl., Ex. 2, at 1. Even so, this does not entirely dispose of the question why Mr. Sato would be willing to rely, in essence, only on Mr. Gavino's version of the events. While Mr. Canalez, the station manager at the Hamilton branch, did appear to have talked to Mr. Bowden, his summary of Mr. Bowden's version of the events was cursory. *See* Sato

Decl., Ex. 1, at 1 ("When I interviewed you ... you stated, 'That's not in my vernacular.' You denied making such statements to Mr. Gavino."). In any event, a jury could find that, despite Mr. Bowden's reported denial, Mr. Sato's decision to terminate a twenty-year employee without interviewing him was suspect.

10. The threat allegedly took place on November 27, 1998. There is no evidence that Mr. Bowden was put, *e.g.*, on emergency off-duty status after the threat.

say?," MSPB Tr. at 113:2–3; and (3) a lack of faith in the EEO process does not seem to be a persuasive reason to speak "only vaguely about the history of racial comments." Bowden Decl. ¶ 5. Nonetheless, credibility is not generally an issue at the summary judgment stage. *See Anderson,* 477 U.S. at 255, 106 S.Ct. 2505 (stating that, in ruling on motion for summary judgment, a judge must leave "credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts" to the jury); *see also Masson v. New Yorker Magazine,* 501 U.S. 496, 520, 111 S.Ct. 2419, 115 L.Ed.2d 447 (1991) (noting that all justifiable inferences must be drawn in favor of nonmoving party, including questions of credibility and the weight to be accorded particular evidence). Although it is a close call, Mr. Bowden's deposition testimony is not sham testimony because it does not squarely contradict what he said before.[11] As the Ninth Circuit has stated:

> While this court has held that a party may not "create his own issue of fact by an affidavit *contradicting* his prior deposition testimony," the non-moving party is not precluded from elaborating upon, explaining or clarifying prior testimony elicited by opposing counsel on deposition; minor inconsistencies that result from an honest discrepancy, a mistake, or newly discovered evidence afford no basis for excluding an opposition affidavit.

*Messick v. Horizon Indus., Inc.,* 62 F.3d 1227, 1232 (9th Cir.1995) (emphasis added).

The USPS contends that, even if Mr. Bowden's testimony about Mr. Gavino's discriminatory remarks is not sham testimony, it is of little to no probative value because Mr. Gavino did not make the decision to remove Mr. Bowden; rather, it was Mr. Sato and Mr. Sato had an honest belief that a threat had been made. *See* Opp'n at 7 (citing *Villiarimo v. Aloha Island Air, Inc.,* 281 F.3d 1054, 1063 (9th Cir.2002) (stating that, in judging whether an employer's stated reasons for its actions is false, it is not important whether they were "objectively false"; courts only require that an employer " 'honestly believe[ ]' " its reasons for its actions)). Thus, the USPS argues that Mr. Gavino's alleged remarks are irrelevant.

However, discriminatory intent may be imputed to an employer not only through the "ultimate" decisionmaker but also through a subordinate who plays a meaningful role in the decision to take the adverse employment action. *See, e.g., Ercegovich,* 154 F.3d at 354–55 (stating that "remarks by those who did not independently have the authority or did not directly exercise their authority to fire the plaintiff, but who nevertheless played a meaningful role in the decision to terminate the plaintiff, were relevant"); *Russell v. McKinney Hosp. Venture,* 235 F.3d 219, 227 (5th Cir.2000) ("[I]t is appropriate to tag the employer with an employee's age-based animus if the evidence indicates that the worker possessed leverage, or exerted influence, over the titular decisionmaker."); *cf. Schnidrig v. Columbia Machine, Inc.,* 80 F.3d 1406, 1411 (9th Cir. 1996) (at summary judgment phase, holding that whether the decisionmaking process was insulated from the discriminatory animus of the board of directors was a question for the jury).[12] In the instant

---

**11.** For example, at the MSPB hearing, Mr. Bowden said, in response to a question about whether he had ever heard Mr. Gavino make derogatory statements about African Americans, "Something that I would take serious, *yes, I have heard it,* but would I take it serious no." MSPB Tr. at 112:25–113:1 (emphasis added).

**12.** In his post-hearing supplemental brief, Mr. Bowden points out that, in a recent opinion, the Sixth Circuit indicated that discriminatory

case, Mr. Gavino arguably played a meaningful role since Mr. Sato decided to remove Mr. Bowden based in large part on what Mr. Gavino, a direct supervisor of Mr. Bowden, said. *See* MSPB Tr. at 69:21 (stating that he did not recall talking with any other individual besides Mr. Gavino before issuing his decision letter to remove Mr. Bowden). Moreover, the USPS seems to contend that Mr. Bowden's prior discipline contributed to the decision to terminate him; if so, Mr. Gavino's intent comes into play for the additional reason that he was the moving force behind those prior disciplinary actions as well. A fact finder may permissibly impute Mr. Gavino's intent to the USPS under these circumstances, particularly since he was vested with the powers of a supervisor. *Cf. Faragher v. City of Boca Raton,* 524 U.S. 775, 807, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (stating that employer is generally vicariously liable for hostile environment created by supervisor); *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 762–63, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) (same).

Finally, the USPS argues that, even if the discriminatory remarks allegedly made by Mr. Gavino can be considered because of his role in the decisionmaking process, there is no nexus between the remarks and the decision to remove Mr. Bowden. It is true that some courts have suggested the importance of a nexus. For example, in *Vasquez,* the Ninth Circuit noted that the plaintiff did not have any direct evidence of discrimination because the only discriminatory remarks were made by a person who was not a decisionmaker and the plaintiff did not show a nexus between these remarks and the supervisor's subsequent employment decision. *See Vasquez,* 349 F.3d at 640. Similarly, in *Sheehan v. Donlen Corp.,* 173 F.3d 1039 (7th Cir.1999), the Seventh Circuit noted that isolated discriminatory comments can constitute direct evidence of discrimination if made contemporaneously with the discharge or if causally related to the discharge decisionmaking process.

---

remarks made by a person involved in the decisionmaking process—even though not the final decisionmaker—are relevant and can establish discrimination. *See DiCarlo v. Potter,* 358 F.3d 408, 415–16 (6th Cir.2004) (concluding that remarks made by plaintiff's direct supervisor constituted direct evidence of discriminatory animus because he recommended that plaintiff be terminated to plaintiff's manager, who agreed with recommendation). The USPS argues that *DiCarlo* is distinguishable because, in the instant case, Mr. Gavino was not part of the decisionmaking process to terminate Mr. Bowden—*i.e.,* he did not recommend that Mr. Bowden be removed because of the alleged threat.

While the Court agrees that the facts in this case are somewhat different from those in *DiCarlo, DiCarlo* is relevant insofar as it holds that the individual whose intent is at issue need not be the ultimate decision maker. Moreover, the cases cited above do not require that the employee who made the discriminatory remarks be part of the decisionmaking chain. For example, in *Russell,* the Fifth Circuit emphasized that the question was whether the employee who made the discriminatory remarks had "influence or leverage over the official decisionmaker, and thus were not ordinary coworkers." *Russell,* 235 F.3d at 226. The employee at issue in *Russell* was a manager at the same level as the plaintiff, and the plaintiff was officially terminated by her supervisor, not by the other employee. "However, [the plaintiff] presented adequate evidence at trial for a jury to find that [the other employee] wielded sufficiently great 'informal' power within the [company] [*e.g.,* he was the son of the CEO of the parent company] such that he effectively became the decisionmaker with respect to [the plaintiff's] termination." *Id.* at 227–28; *see also Ercegovich,* 154 F.3d at 354–55 (noting that employee who made discriminatory remarks was involved in some parts of discussion to eliminate plaintiff's position; stating that this employee, as head of division, was in position to shape attitudes of division managers, including the one who ultimately decided to eliminate plaintiff's position).

*See id.* at 1044 (noting that person making discriminatory remarks had authority over plaintiff, that his remarks were contemporaneous with her firing, and that his remarks were related to his motivation for the decision); *see also DiCarlo,* 358 F.3d 408, 417 ("[T]he fact that the comments were made by Bailey, [plaintiff's] immediate supervisor and a decision-maker, that they specifically negatively and derogatorily referenced [plaintiff's] Italian–American heritage, and that the hate-speech occurred three weeks prior to [plaintiff's] termination, all culminate in the conclusion that [plaintiff] has presented sufficient evidence of causation to withstand summary judgment.").

These cases, however, do not preclude Mr. Bowden from relying on Mr. Gavino's discriminatory remarks as *circumstantial* evidence of discrimination/pretext, especially since there are facts to support Mr. Gavino's having played a meaningful role in the decision to terminate. *See, e.g., Nesbit v. Pepsico, Inc.,* 994 F.2d 703, 704–05 (9th Cir.1993) (stating that comment by plaintiff's supervisor that "we don't necessarily like grey hair" was uttered in an ambivalent manner and was not tied directly to plaintiff's termination and so was "at best weak circumstantial evidence of discriminatory animus"); *Ercegovich,* 154 F.3d at 355 (noting that "the absence of a direct nexus does not necessarily render a discriminatory remark irrelevant").

Moreover, there is evidence that there is a nexus between at least one of the discriminatory remarks and Mr. Bowden's removal. As discussed above, on either November 21 or 27, 1998, Mr. Gavino allegedly said to Mr. Bowden, "I'm going to get you, 'nigger,'" when Mr. Bowden told Mr. Gavino that he was going to see the doctor even though Mr. Gavino said that he could not leave the workroom floor. *See* Bowden Dep. at 55:15–25. This discriminatory remark, "I'm going to get you,

'nigger,'" was made either the week before or the day of the alleged threat by Mr. Bowden, which was the basis of his removal. One could reasonably infer, therefore, that Mr. Gavino made up the story that Mr. Bowden threatened him as a way to "get back" at Mr. Bowden. Because of the plausible connection to the adverse employment action, including the proximity in time to the incident at issue here, this remark could constitute probative evidence of discriminatory motive. *See Marques v. Bank of Am.,* 59 F.Supp.2d 1005, 1019 (N.D.Cal.1999) (noting that one factor considered by the Ninth Circuit in determining whether a remark constitutes more than a "stray remark" is "whether the comment is related in time and subject matter to the decisional process"); *see also DiCarlo,* 358 F.3d 408, 417 (pointing out that discriminatory remarks occurred three weeks prior to termination of plaintiff, thus supporting causal connection). That Mr. Gavino allegedly made other discriminatory remarks—two more involving the word "nigger" and one involving "hanging on the corner of East Palo Alto"—is additional circumstantial evidence of discriminatory intent. *See id.* (noting that another factor considered by Ninth Circuit in determining whether remark is more than "stray remark" is "whether there are multiple comments or only a single statement").

### III. *CONCLUSION*

For the foregoing reasons, the Court holds that assuming all the facts proffered by Plaintiff are true and drawing all inferences in his favor, there is a genuine dispute as to: (1) whether Mr. Bowden is similarly situated to employees outside his protected class who were treated more favorably and (2) whether the USPS's asserted reason for its decision to remove Mr. Bowden was a pretext for discrimina-

tion. Accordingly, the Court DENIES the USPS's motion for summary judgment.

IT IS SO ORDERED.