**Michael WARREN, Plaintiff,**

v.

**INTERNATIONAL BUSINESS MACHINES CORPORATION, Defendant.**

**No. 03 Civ. 3340(DC).**

United States District Court, S.D. New York.

Feb. 24, 2005.

---

Chao & Edelson LLC by Brendan Chao, Christopher P. Edelson, New York, NY, for Plaintiff. ·

Jackson Lewis LLP by Kevin G. Lauri, New York, NY, for Defendant.

## OPINION

CHIN, District Judge.

In this employment discrimination case, plaintiff Michael Warren alleges that defendant International Business Machines Corporation ("IBM") discriminated against him because of his membership in the armed services, in violation of federal and state law. Warren was a member of the United States Army Reserve (the "Reserve"), and shortly after he returned from a twenty-five day training mission, IBM fired him.

IBM moves for summary judgment dismissing all claims. With the exception of three claims, the motion is denied, for a reasonable jury could surely find that Warren's status in the Reserve was a substantial or motivating factor in IBM's decision to discharge him. A reasonable jury could find that IBM's stated reason for dismissing Warren was pretextual, and the record contains substantial evidence showing that IBM was unhappy with Warren's repeated absences for Reserve duty and the possibility that he could be called for further service or even active duty on short notice. Accordingly, I conclude that genuine issues of fact exist for trial.

## BACKGROUND

### A. The Facts

Construed in the light most favorable to Warren, as the party opposing summary judgment, the facts are as follows:

### 1. Warren's Employment with IBM

IBM hired Warren as a vendor relations specialist in August 1994, while he was a Master Sergeant in the Reserve. (Warren Dep. at 43; IBM Mem. at 3; Warren Mem. at 2). Warren transferred to the Global Security group within IBM in August 1999 and worked for that division until he was discharged on September 27, 2002. (*See id.;* Lauri Aff. Ex. AA; Warren Dep. at 196). He received favorable year-end reviews in at least 1999, 2000, and 2001. (Lauri Aff. Ex. J).

At some point after Warren joined the Global Security group, it began to work on a bid to run the worldwide computer operations of JPMorgan Chase (the "Deal"). Warren worked on security aspects of the Deal and was "actively involved" in meeting with the client. (Warren Dep. at 196; Warren Decl. ¶¶ 4, 9). Members of the Deal team and the Global Security group "were under an enormous amount of pressure to close the ... [D]eal," and ultimate-

ly the Deal did close—for $6.2 billion. (*Id.* ¶ 12; Stark Dep. at 24).

### 2. *Warren's Reserve Status*

Warren joined the Reserve in 1986 and served continuously in the Reserve during the time he was employed by IBM. (Warren Dep. at 18). Members of the Reserve generally participate in drills one weekend a month and in annual training for between fourteen and twenty-one days a year. (*Id.* at 19).[1] Since 2000, Warren has been part of a training battalion based in Louisiana that trains soldiers to be military police officers. (Warren Dep. at 26–28). During Warren's annual training and additional service, he trains soldiers as a member of the battalion. (*Id.*).

In 1999 and 2000, Warren participated in annual training but did not serve any additional duty. (*Id.* at 26).[2] After September 11, 2001, Brian Bauer, a manager in the Global Security group and supervisor to Warren, became aware that Warren might be called for additional service, because of his membership in the Reserve. (Bauer Dep. at 142). Warren's immediate supervisor, Rob Jones, had about fifteen to twenty conversations with Warren in 2001 about his service in the Reserve. (Warren Dep. at 74). Jones asked Warren "frequently, if not weekly, daily, if [he] knew what was happening with [his] status in the [Reserve]." (*Id.* at 75).

In 2001, Warren served a mission of about twenty-one days in addition to annual training of about twenty-one days. (*Id.* at 26–27).[3] He also served two different times in 2002. The first was his annual training in June 2002, for about nineteen to twenty-one days. (*Id.*). The second was an unplanned training mission (the "Pop-up Mission"), in which he again trained soldiers, from approximately August 16, 2002 to September 9, 2002, or twenty-five days. (*Id.* at 27–29).[4]

After Warren's June 2002 annual training, Jones told Warren "you are killing me." (*Id.* at 94). According to Warren:

if I'm recollecting the correct conversation, which I say because we have had so many Reserve[ ] conversations ... post 9/11 to now, um, I returned from Re-

---

**1.** The parties are imprecise in their use of the terms "active duty" and "annual training." The statute covering Reserve components provides that "[w]henever Congress determines that more units ... are needed for the national security than are in the regular components of the ground and air forces," the National Guard together with units of other reserve components necessary for a balanced force "shall be ordered to active duty and retained as long as so needed." 10 U.S.C. § 10103. "Active duty" technically refers to service "in time of war or national emergency, and at such other times as the national security may require, to fill the needs of the armed forces" whenever more units are needed than are in the regular components. *See* 10 U.S.C. § 10102. Here, Warren participated in weekend training, referred to as "drills" on the United States Army website, as well as annual training of approximately two weeks a year. *See* http://www4.army.mil/USAR/capabilities/training.php (last visited Feb. 24,

2005). The latter service is technically "active duty for training" but is referred to herein as "annual training." *See* 10 U.S.C. § 10147; *see also* 10 U.S.C. § 10145.

**2.** Warren's testimony does not address weekend service, but presumably Warren participated in weekend drills during 1999, 2000, 2001, and 2002 in addition to the service discussed here.

**3.** It is not clear if the mission was technically "active duty for training" or "active duty."

**4.** These numbers are approximate. In its motion papers, IBM claims that Warren served 31, 18, 41, and 26 days on "active duty" in 1999, 2000, 2001, and 2002, respectively (IBM Mem. at 3), but the record contains conflicting information. (*See* Lauri Aff. Ex. E; Warren Dep. at 27, 31–32, 114). The parties agree that Warren served more time in 2001 and 2002 than in 2000.

serve[ ] [in June or July 2002] after, gosh, it was I think 16, 18 days, and I had been told, while at Reserve[ ], that there was a possibility of us being given this pop-up mission. . . .

[W]hen this pop-up mission came, [the Deal] was literally on fire . . . .

[M]y time in the [D]eal was so critical and key to the security solution of that [D]eal, my first thought [was]["]Rob, there is a potential I may be activated. We've got to come up with a plan to place someone or get someone with me to do the [Deal]". ["] And he literally told me, ["Y]ou are killing me, you know. I don't have the resource to hire anybody. We don't have the budget.

["]We need, you know, we need to know what is happening, basically. What is up with the Reserve[."] That's pretty much the conversation.

(*Id.* at 94–95).

At some point, Jones asked Warren if Warren had to go on the Pop-up Mission and whether it was a requirement of Reserve service. According to Warren, Jones also said

I have to pay you, right.

We have to look at how we're going to do this system because I am paying you. You are full salary while you are away. And I need to know how to go about the IBM way of you submitting your pay vouchers and us paying the difference, if you are going to be activated.

(*Id.* at 98–99).

When he discussed Reserve duty with Jones and Bauer, Warren could "visibly see" that they were frustrated. (*Id.* at 104–05). A superior to Warren asked Warren if he could get out of Reserve duty. (*Id.* at 162; *see* Bauer Dep. at 155 (testifying that the superior, Andrea Sayles, was "[d]irector level or executive

level" and a peer to Bauer's manager)). Because of the Deal, Warren contacted his Reserve superior before he went on the Pop-up Mission and requested that he participate in only half the forty-five day mission. (Warren Dep. at 132–33). The request was granted and he was ordered to report on August 16, 2002, instead of late July or early August. (*Id.* at 133–34).

### 3. *The Voicemail Message*

The day before he left on the Pop-up Mission, Warren, who was in New York, attempted to have a phone conversation about the Deal with Liz Drummond, an IBM employee based in the United Kingdom. (*See id.* at 181–82, 187). Drummond, who worked in the Global Security group's European, Middle East and Africa division ("EMEA"), was responsible for reviewing certain budgetary aspects of the Deal and she wanted Warren to answer questions before he went on the Pop-up Mission. (Drummond Dep. at 15, 19–20). Drummond and Warren had had a working relationship for years; they had participated in phone conversations and exchanged various e-mails, but had never met in person. (Drummond Dep. at 6; Lauri Aff. Ex. N; Warren Dep. at 157).

Unable to reach Drummond on the phone, Warren left the following message on her office voicemail on August 15, 2002:

Liz, this is Michael Warren. I'm gonna try you on your mobile. Pretty soon I'm gonna hunt you down and kill you. I'm gonna get on a plane and I'm gonna come to EMEA and I'm going to, um, errrrh, I'm gonna track you down. I'll talk to you in a minute. Bye bye.

(Lauri Aff. Ex. P;[5] Drummond Dep. at 22).

---

**5.** IBM provided the actual recording of the message, and the Court has listened to it.

Warren was apparently joking in the message. His tone is calm and casual; there does not appear to be any intensity or anger in it. (Lauri Aff. Ex. P). His voice is not raised and he seems to be calling someone he talks to frequently. The "errrrh" sounds like playful frustration. In fact, the tone could even be considered one of endearment, with the sentences after "errrrh" trying to reassure Drummond that Warren would talk to her before he left town. (*Id.*).[6]

According to Warren, the sort of language he used in the message was not uncommon for the Deal team. (Warren Dep. at 191). Warren explained that "it's a whole bunch of New Yorkers and some out-of-towners in an office . . . . It's almost like a Soprano's episode, where all the Texans or the people from London . . . are trying to say things like ["H]ey boss, you want I should kill him[?"] . . . [Management-level] Andrea Sayles is privy to it. . . . It's just kind of a tone and feel of the [D]eal." (*Id.* at 191–92). It is not clear if Drummond was aware of this rapport, but on one occasion she allegedly joked to Warren that "you take out Brian Bauer, I will take out [Drummond's supervisor] John Simmons, we'll run this business." (*Id.* at 192–93). Warren said of this latter incident they were "goofing around on the phone." (*Id.*).

### 4. *IBM's Initial Response to the Message*

Drummond received the phone message while in the Copenhagen airport returning from a business meeting.[7] (Drummond Dep. at 22). She did not feel physically intimidated by the message and said she could "quite accept he meant it in a joking sense" but felt it was inappropriate and unprofessional. (*Id.* at 23–25; Ex. Q (e-mail message from Drummond to Simmons)).

The following morning, on August 16, 2002, Warren flew from New York to begin the Pop-up Mission. (Warren Dep. at 187). Drummond sent Warren two e-mail messages that day. In the first e-mail, Drummond wrote:

> Michael,
>
> I feel we are getting somewhere now. I appreciate we are not going to have all the responses but I must have the details of where the gaps, "not knowns" are in order to be able to respond.
>
> . . .
>
> Thanks for the copy of the MSSD document . . . it is important to know we are working from the same version. . . .
>
> regards Liz.

(Chao Affirm. Ex. 7).

In the second message, Drummond allegedly asked Warren to call her, so that she could tell him the telephone message was "out of order." (*See* Lauri Aff. Ex. N (e-mail message from Drummond to Simmons's deputy, Jane Mason, referring to message from Drummond to Warren)).[8] Drummond did not receive responses to the two e-mail messages, and ultimately her questions about the Deal were answered by another IBM employee. (Drummond Dep. at 20; Lauri Aff. Ex. Q).

---

**6.** IBM takes the position that the message was a threat. A reasonable jury could find, based on the tone and words of the message, that Warren was joking. Accordingly, I assume for purposes of this motion that Warren was joking.

**7.** According to Warren, he also left a subsequent message for Drummond explaining that he had left her a "goofy message." (Warren Dep. at 182–83). Drummond has said that she did not receive a second message from Warren. (Lauri Aff. Ex. Q (e-mail message from Drummond to Simmons)).

**8.** The parties did not provide the text of the second e-mail message.

Drummond discussed the message with her superiors in the United Kingdom. (Drummond Dep. at 27–28). She was not, however, contacted by anyone in the United States about it. (Warren Dep. at 27). Jones allegedly conducted an investigation into the message that lasted three to five weeks, but at no point did Drummond speak to Bauer, Jones, Kory Teoman, Bauer's supervisor, or any IBM human resources employee about the message. (Bauer Dep. at 175; Drummond Dep. at 27, 39–41, 45). Drummond did not know if anyone in the United Kingdom conducted an investigation into the matter and was not told about an investigation in the United States. (*Id.* at 27, 45).

When Warren returned on September 10, 2002 after Reserve service, he was asked by IBM to fly to Austin, where he was told by both Jones and Bauer that the message was being investigated as a threat. (*See* Lauri Aff. Ex. U; Warren Dep. at 187–88). Bauer reportedly told Warren that "you are fine. It takes two levels of management to hurt you, and neither of us believe[s] it was a threat." (*Id.*). Warren had not been contacted about the message while he was on the Pop-up Mission, even though he did participate in calls regarding the Deal and was generally available for work-related conversations while on Reserve duty. (Bauer Dep. at 175; Warren Dep. at 168, 183). After his discussions with Jones and Bauer, Warren returned to New York to work on the Deal. (*Id.* at 190–91). The Deal team began to be scaled back around September 24, 2002, after IBM submitted a bid and was awaiting a decision. (*See id.* at 123, 201).

### 5. *The Termination of Warren's Employment*

In an internal IBM e-mail message dated September 25, 2002, Teoman wrote that "[a]lthough [Warren] (11[sic] years with IBM) has had an upstanding record, the action is serious enough to require immediate and drastic action.... [W]hile [Drummond] did not feel threatened by the voice message she was not willing to work with [Warren] in the future." (Lauri Aff. Ex. Y). According to Drummond, however, she did not tell her supervisor Simmons or his deputy—the only people that the record shows she talked to about the message—that she did not want to work with Warren following the message. (Drummond Dep. at 28). Another internal e-mail written by Teoman on the same day noted that Jones and Bauer thought discharging Warren was too harsh a measure but that Teoman did not. (Chao Affirm. Ex. 9).

Warren was then called to Austin to meet with Jones, and he did so on September 27, 2002. (Warren Dep. at 196). Jones told him that he was being discharged with cause and that "an investigation had been performed, and it was determined that [Warren] had violated business conduct guidelines and was being terminated under zero tolerance policy." (*Id.* at 196–97).

Prior to his discharge, Warren was not aware of any zero-tolerance policy. (*Id.* at 229). IBM does not have a written zero-tolerance policy and the phrase is used informally in "people's communications." (Bauer Dep. at 26–27, 69).[9]

IBM has provided several explanations for Warren's discharge. Before Warren

---

**9.** Although an IBM human resources executive states that the company "has a zero tolerance policy concerning employee threats of physical harm to other IBM employees [and i]n each circumstance that an IBM employee has physically threatened a co-worker ... that employee has been discharged[,]" no description of these incidents has been provided. (*See* Linroth Decl. ¶¶ 4, 6). Hence, it is

was discharged, Bauer and Jones reportedly did not think the voice message was a real threat. (*See* Warren Dep. at 187–88; Chao Affirm. Ex. 9). Jones told Simmons, Drummond's supervisor, that he had discussed with Warren the "unacceptable nature of the message and that it was a condition of employment that it never happen again. [Bauer] had a similar conversation with him .... We both were satisfied that Michael recognizes the seriousness of this and that it will never happen again." (Chao Affirm. Ex. 8). Bauer acknowledged that the investigation was not about Warren's ability to carry out the threat, but whether he left a "death threat." (Bauer Dep. at 179). He subsequently testified that Warren was not discharged for violating a policy, but for making a threat. (*Id.* at 25). Finally, at the time of the discharge, Jones told Warren that he had violated a zero-tolerance policy. (Warren Dep. at 197).

## B. *The Instant Action*

Warren filed this action on May 12, 2003, alleging violations of the Uniformed Services Employment and Reemployment Rights Act ("USERRA"), 38 U.S.C. § 4301 *et seq.*, and the New York State Soldiers' and Sailors' Civil Relief Act, N.Y. Military Law § 317 (McKinney 2004). Warren claims that IBM discriminated against him by discharging him in violation of §§ 4311 and 4316 of USERRA and by failing to reemploy him in violation of § 4312 and New York Military Law § 317.

The parties engaged in discovery and this motion followed.

## DISCUSSION

### A. *Applicable Law*

#### 1. *Summary Judgment Standard*

The standards governing motions for summary judgment are well-settled. A court may grant summary judgment only where there is no genuine issue of material fact and the moving party is therefore entitled to judgment as a matter of law. *See* Fed R. Civ. P. 56(c); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Accordingly, the court's task is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). There must be sufficient evidence in the record to support a jury verdict in the nonmoving party's favor to create an issue for trial. *See id.*

To defeat a motion for summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586, 106 S.Ct. 1348. As the Supreme Court stated in *Anderson*, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505 (citations omitted). The nonmoving party may not rest upon mere conclusory allegations or denials, but must set forth "concrete particulars" showing that a trial is needed. *Nat'l Union Fire Ins. Co. v. Deloach*, 708 F.Supp. 1371, 1379 (S.D.N.Y. 1989) (quoting *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir.1984) (internal quotations omitted)). Accordingly, it is insufficient for a party opposing summary judgment "merely to assert a conclusion without supplying supporting arguments or facts." *BellSouth Telecomms., Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir.1996) (internal quotations omitted).

unclear whether any of these incidents is similar to the situation at hand.

## 2. *The Merits*

### a. *USERRA*

USERRA replaced the Veterans' Reemployment Rights Act (the "VRRA") in 1994, primarily to "clarify, simplify, and, where necessary, strengthen the existing veterans' employment and reemployment rights provisions." *Gummo v. Village of Depew,* 75 F.3d 98, 105 (2d Cir.1996) (quoting H.R.Rep. No. 103–65(I), at 2451 (1993)). The statute is intended to: (1) "encourage noncareer service in the uniformed services by eliminating or minimizing the disadvantages to civilian careers and employment which can result from such service"; (2) minimize disruption in the lives of both service members and their employers; and (3) "prohibit discrimination against persons because of their service in the uniformed services." 38 U.S.C. § 4301(a).

The term "service in the uniformed services" is defined as

the performance of duty on a voluntary or involuntary basis in a uniformed service under competent authority ... [including] active duty, active duty for training, initial active duty for training, inactive duty training, full-time National Guard duty, a period for which a person is absent from a position of employment for the purpose of an examination to determine the fitness of the person to perform any such duty, and a period for which a person is absent from employment for the purpose of performing funeral honors duty.

38 U.S.C. § 4303(13).

USERRA is the most recent in a series of statutes that seeks to protect both reservist and non-reservist service members from discrimination. Since 1940, when the first related statute protected veterans returning to civilian positions, reemployment rights have been incrementally extended to those in the reserves and National Guard. *See Rogers v. City of San Antonio,* 392 F.3d 758, 764–65 (5th Cir.2004). The VRRA itself was amended in 1968 to prohibit discrimination against reservists. *Id.* These amendments were made to address "[e]mployment practices that discriminate[d] against employees with Reserve obligations." *See* S.Rep. No. 90–1477 (1968), *reprinted in* 1968 U.S.C.C.A.N. 3421, 3421. At the time, thousands of Reserve and National Guard members had been ordered to active duty, a third of whom had served for more than two years. *Id.* at 3422.

Despite Congress's awareness of discrimination against reservists, under the VRRA many protections and responsibilities were still based on distinctions among types of training or duty performed. *See generally* H.R.Rep. No. 103–65(I) (1993), reprinted in 1994 U.S.C.C.A.N. 2449, 2456. USERRA altered that by basing protections and responsibilities on actual time spent participating in service. *See id.* at 2452, 2459–60 (explaining that because of the blurring of the distinctions between types of service, "it is no longer rational or equitable to make rights and obligations" dependent on types of service); S.Rep. No. 103–158 (1993), 1993 WL 432576, at *43. The shift was in part an acknowledgment that changes in military policy had altered the nature of Reserve service, giving some Reserve components greater responsibility and requiring longer periods of service. H.R.Rep. No. 103–65(I), at 2451; S.Rep. No. 103–158, at *39. Congress believed the VRRA had occasionally produced inequitable results among employees serving in different categories who were absent for similar lengths of time. *Id.,* at *43.

In this case, Warren relies on §§ 4311, 4312, and 4316 of USERRA. Section 4311 is an antidiscrimination provision; it prohibits discrimination against persons who serve in the uniformed services because of

their membership in a uniformed service or because of their service obligation. 38 U.S.C. § 4311(a). An employer is considered to have engaged in prohibited actions if the employee's membership or obligation for service "is a motivating factor in the employer's action, unless the employer can prove that the action would have been taken in the absence of such membership" or obligation for service. 38 U.S.C. § 4311(c)(1).

Section 4312 provides that any person whose absence from a position of employment is necessitated by service in the uniformed services is entitled to reemployment rights. *See* 38 U.S.C. § 4312(a).

Section 4316 does more than prohibit discrimination; it changes the at-will status of covered individuals. It provides that a person reemployed under USERRA shall not be discharged from employment, except for cause, "within 180 days after the date of such reemployment, if the person's period of service before the reemployment was more than 30 days but less than 181 days," or within one year after the date of reemployment if the service was more than 180 days. 38 U.S.C. § 4316(c). In contrast to § 4311, which protects all service members from adverse employment action based on their membership, § 4316(c) protects only those who serve for more than thirty days. *See* H.R.Rep. No. 103–65(I), at 2468 (explaining that proposed § 4315(d), identical in

relevant part to current § 4316(c), relates "the period of special protection against discharge without cause to length, not type, of military service.") (citation omitted).[10]

### b. *New York Military Law § 317*

Where an employee leaves a position of employment to perform military service and applies for reemployment within ninety days after being relieved from service, § 317 of New York State's Soldiers' and Sailors' Civil Relief Act provides that an employer must restore the employee to the position, except in limited circumstances. Military Law § 317 ¶ 1. Any person who is restored to a position in accordance with the statute shall not be discharged from the position without cause within one year of the restoration. *Id.* ¶ 4.

### B. *Application*

#### 1. *Violation of 38 U.S.C. § 4311*

■ The language of § 4311(c)(1) tracks that of the burden-of-proof allocation approved by the Supreme Court in *NLRB v. Transp. Mgmt. Corp.*, 462 U.S. 393, 401, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983), and the Second Circuit has found that Congress intended courts to apply that scheme. *See Gummo*, 75 F.3d at 106 (discussing former subsection 4311(b), identical in relevant part to current subsection 4311(c)(1)).[11] Under the *Transportation Management* framework,

---

**10.** Sections 4311 and 4316 seem to have evolved independently of each other. Language similar to § 4311 was first introduced in 1968 specifically to protect reservists from discrimination. S.Rep. No. 90–1477, 1968 U.S.C.C.A.N. at 3421; *Rogers*, 392 at 764–65. At that time, and until it was amended in 1994, the provision comparable to § 4316(c) protected service members returning from active duty against discharge without cause for a period of one year and reservists returning from initial active duty for training for six months. H.R.Rep. No. 103–65, at 2468;

S.Rep. No. 90–1477, 1968 U.S.C.C.A.N. at n. 4.

**11.** This and other courts in USERRA cases have also applied the three-part burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Key v. Hearst Corp.*, 963 F.Supp. 283, 288 (S.D.N.Y.1997). Analysis under the *McDonnell Douglas* framework is similar to that under *Transportation Management*, but "it appears that the NLRB framework is the preferable approach for US-

a claimant carries his burden of proving a *prima facie* case of discrimination by showing, by a preponderance of the evidence, that his protected status was "a substantial or motivating factor in the adverse [employment] action"; but the employer may nonetheless escape liability by showing, as an affirmative defense, that it would have made the same decision without regard to the employee's protected status.

*Id.* (citing *Transp. Mgmt.*).

The Court must therefore determine (a) whether there is sufficient evidence from which a rational jury could infer that Warren's status or conduct as a reservist was a substantial or motivating factor in his dismissal; and (b) if there is such evidence, whether IBM demonstrated that it would have discharged Warren if he had not been a reservist. *Id.* at 106–107.

### a. *Warren's Showing of Discrimination*

Warren has demonstrated a *prima facie* case of discrimination based on his protected status as a military reservist. A reasonable jury could find, from the following evidence, that Warren's protected status was a substantial or motivating factor in IBM's decision to fire him.

First, he was a reservist and his service in the Reserve required that he be absent from work a significant number of days each year.

Second, his supervisors and other members of the Deal team were seemingly unhappy about his absences. They questioned him frequently about his Reserve service and the possibility he could be called for additional service or even to active status. Jones said that Warren's absence was "killing" him, citing the budgetary impact of Warren's absences and the unavailability of funding to hire a replacement. Another IBM senior manager asked Warren to try to get out of the Pop-up Mission, and Warren indeed asked to be relieved from half of the mission.

Third, as discussed below, a jury could reasonably find that IBM's articulated basis for discharging Warren was pretextual, and the circumstances suggest, and a jury could so find, that the pretext was to cover up IBM's discriminatory intent. A reasonable jury could find that Warren was joking when he left the voicemail for Drummond, and that discharging an employee with an excellent eight-year employment record was exceedingly, and irrationally, harsh.

Fourth, the shifting and inconsistent explanations offered by IBM for its decision to discharge Warren provide further evidence of discrimination. *See Harris v. City of Montgomery*, 322 F.Supp.2d 1319, 1328 (M.D.Ala.2004) (summary judgment denied in USERRA case where, *inter alia*, a reasonable jury could infer discriminatory motivation by defendant providing inconsistent reasons for not giving plaintiff merit-based raise); *Bowden v. Potter*, 308 F.Supp.2d 1108, 1120 (N.D.Cal.2004) (finding that reasonable jury could find defendant's stated reason for discharging plaintiff pretextual where, *inter alia*, defendant claimed it removed plaintiff for violation of zero-tolerance policy that was not mentioned at time of firing).

Fifth, the timing of Warren's discharge raises an inference of discrimination. Warren was informed that an investigation into the message was underway when he

ERRA cases." *Fink v. City of New York*, 129 F.Supp.2d 511, 519–20 (E.D.N.Y.2001). *See also Gummo*, 75 F.3d at 106; *Sheehan v. Dep't of Navy*, 240 F.3d 1009, 1013 (Fed.Cir.

2001); *Hill v. Michelin N. Am., Inc.*, 252 F.3d 307, 312 (4th Cir.2001); *Leisek v. Brightwood Corp.*, 278 F.3d 895, 898–99 (9th Cir.2002).

returned from the Pop-up Mission, yet he was allowed to continue working on the Deal. It seems that he was not fired until crucial aspects of the Deal were completed and IBM's bid was submitted. The day he was discharged, he was scheduled to begin work on a new project. A reasonable jury could find that IBM was motivated to discharge him because of his membership in the Reserve. Even though the company hired Warren when he was a reservist, his potential to serve increased dramatically after September 11, 2001. If IBM had not discharged Warren, it would have had to continue to bear the cost of replacing him during temporary absences and the risk that he would be asked to serve for an extended amount of time.

Under these circumstances, a reasonable jury could surely find that the most likely explanation—indeed, the only logical explanation—is that IBM discharged Warren because of the continued absences caused by his membership in the Reserve and the possibility that he would be summoned to additional and possibly extended service.

### b. *IBM's Showing of Non–Discriminatory Reason*

Because Warren has demonstrated a *prima facie* case of discrimination, the burden of proof shifts to IBM to show, as an affirmative defense, that it would have made the same decision without regard to Warren's protected status. IBM argues that Warren was discharged because the telephone message left for Drummond was a death threat against Drummond and that, in addition, IBM has a zero-tolerance policy on threats.

In Warren's message to Drummond, he says "[p]retty soon I'm gonna hunt you down and kill you. I'm gonna get on a plane and I'm gonna come to EMEA." Taken alone, these words could lead a company to fire an employee. But if the message is contemplated in a broader context—the tone of Warren's voice, the words he used, his history with IBM, and the physical distance between Warren and Drummond—a reasonable jury could find that it was not a real physical threat. Warren ends the message with "I'll talk to you in a minute. Bye bye." A rational fact-finder could certainly find that Warren was joking.

Indeed, the recipient of the message and Warren's two most direct supervisors did not believe that the message was meant as a physical threat. Drummond even sent Warren a conversational e-mail about business issues the following day. Warren had no history of immature, irrational, or violent behavior in his eight years with IBM. In addition, Warren testified that this sort of language was not uncommon for the Deal team. A jury could therefore find that the stated reason for Warren's discharge, the alleged threat, was a pretext, and that IBM would not have discharged Warren for the voicemail were it not because of his protected status. Genuine issues of material fact exist to be tried as to whether IBM actually had a zero-tolerance policy; if so, what that policy provided; whether Warren actually violated that policy; and why, in fact, Warren was fired.

Even if a zero-tolerance policy did exist, it would not preclude denial of summary judgment. *Compare Clark v. Runyon*, 218 F.3d 915, 918–19 (8th Cir.2000) (discharge for violation of zero-tolerance policy not pretextual where plaintiff threatened to beat co-workers and had a history of violence and threats), *and Bonilla v. Potter*, No. 02 Civ. 762, 2004 WL 1925051, 2004 U.S. Dist. LEXIS 13490 (M.D.Fla. July 12, 2004) (zero-tolerance policy violated by plaintiff who got in verbal argument with co-worker and threatened physical violence), *with Bowden*, 308 F.Supp.2d 1108 (N.D.Cal.2004) (summary judgment denied

despite zero-tolerance policy where, *inter alia*, plaintiff verbally threatened supervisor by saying "I'll bust a cap in your fat ass" but defendant did not take steps to protect co-workers).

Finally, the record contains evidence that IBM did not conduct a thorough investigation. Warren was not contacted about the message while he was on the Pop-up Mission, although he was contacted about other business matters. The recipient of the message was not interviewed about the message or her relationship with Warren. It is not clear what the investigation consisted of or the criteria used to evaluate the message. These circumstances provide further support for Warren's claim of pretext.

In sum, genuine issues of material fact exist and IBM cannot prevail on this claim as a matter of law. Accordingly, the motion for summary judgment is denied as to the § 4311 claim.

### 2. *Violation of 38 U.S.C. § 4312*

Warren does not oppose the prong of IBM's motion that seeks relief from the claim under § 4312. (Warren Mem. at 2 n. 1). Warren apparently acknowledges that he was reemployed after the Pop-up Mission was completed on September 9, 2002. Hence, this claim is dismissed.

### 3. *Violation of 38 U.S.C. § 4316*

IBM argues that under § 4316(c) the "period of service before the reemployment" must be more than thirty continuous days immediately prior to reemployment for a service member to be protected from discharge without cause.[12] Warren contends that the "period of service" in the statute refers to the armed services' fiscal year preceding reemployment. To find otherwise, Warren argues, would deny re-

lief under § 4316(c) to reservists who do not serve for more than thirty continuous days.

#### a. *Interpretation of § 4316(c)*

Construction of a statute "must begin with the words of the text." *Saks v. Franklin Covey Co.*, 316 F.3d 337, 345 (2d Cir.2003). The plain meaning of the words, however, must be considered "by looking to the statutory scheme as a whole and placing the particular provision within the context of that statute." *Id.* Whether the words are plain in their meaning or ambiguous, as the Supreme Court has held:

> [i]n the interpretation of statutes, the function of the courts is easily stated. It is to construe the language so as to give effect to the intent of Congress....
>
> ... When aid to construction of the meaning of words, as used in the statute, is available, there certainly can be no "rule of law" which forbids its use, however clear the words may appear on "superficial examination."

*United States v. Am. Trucking Ass'ns*, 310 U.S. 534, 542–43, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940) (footnotes omitted). Hence, the apparent facial meaning of a statute does not preclude the Court's examination of the statute's purpose. *See Train v. Colo. Pub. Interest Research Group*, 426 U.S. 1, 10, 96 S.Ct. 1938, 48 L.Ed.2d 434 (1976).

In determining the meaning of "period of service before the reemployment" in § 4316(c), I consider the words of the statute, its purpose, and the legislative intent. Like the legislation that preceded it, USERRA should be liberally construed for the benefit of those who serve their country. *McGuire v. United Parcel Service*, 152 F.3d 673, 676 (7th Cir.1998) (citing

---

12. The parties agree that Warren served on the Pop-up Mission for under thirty days.

*Fishgold v. Sullivan Drydock & Repair Corp.*, 328 U.S. 275, 66 S.Ct. 1105, 90 L.Ed. 1230 (1946)).

### b.  *The Words of the Statute*

■ Section 4316 protects a person who is reemployed under USERRA from discharge without cause for a period of 180 days "if the person's period of service before the reemployment was more than 30 days but less than 181 days." The language is ambiguous as to whether the "period of service" refers to a cumulative number of days or to consecutive days of service. Warren would have the Court read into the statute the phrase "within the fiscal year" after "period of service." IBM, on the other hand, would have the Court read the word "continuous" before "period of service."

■ Three provisions of USERRA support IBM's position. First, the word "period" in § 4316 is singular, implying that it refers to a single, continuous period of service.

Second, § 4312(a)(2) specifically uses the word "cumulative" to provide that reemployment rights apply only to those whose "cumulative length of ... absence and of all previous absences ... with that employer ... does not exceed five years." Thus, in at least one section of USERRA, and in contrast to § 4316(c), Congress used the word "cumulative" when it intended reservists to add up their days of service.

Third, in § 4312(e), Congress arguably used the words "period of service" to designate consecutive days of service. Section 4312(e) sets deadlines, based on length of absence, for reservists returning from service to notify employers of their intent to return to work. *See* H.R.Rep. No. 103–65, at 2462 (explaining that the proposed time limits would depend on the length of service "from which the service-

person is being discharged or released"). In the case of a person whose period of service was less than thirty-one days, he or she must report to the employer no later than the first work day "following the completion of the period of service and the expiration of eight hours after a period allowing for the safe transportation of the person from the place of that service to the person's residence." § 4312(e)(1)(A). A person whose period of service is longer than thirty days but less than 181 days has fourteen days to apply for reemployment. § 4312(e)(1)(C).

It does not seem logical to interpret "period of service" in this provision to be cumulative because, in the case of someone who served more than thirty days in short intervals, the statute would require the reservist to report to the employer almost immediately after absences up to the point where thirty-one days had accumulated, at which time the reservist would be granted fourteen days to report to work. This would be unnecessarily disruptive for employers and result in a windfall for reservists. A fourteen-day period is, however, reasonable to ease the transition to civilian life for service members who are absent for more than thirty continuous days and to keep employers aware of the status of their employees.

Accordingly, although the statutory language is not free from ambiguity, the more logical interpretation is that "period of service" refers to consecutive days of service.

### c.  *Legislative Intent*

A central goal of § 4316(c) is to provide employment retention rights based on the length of uniformed service, "which may give rise to a need for time to retrain and readjust to the civilian job after an absence." S.Rep. No. 103–158, at *63 (discussing proposed § 4316(e), identical to

current § 4316(c)). The VRRA had different conditions but the same goals: "to allow a sufficient period for the returning servicemember to gain proficiency in new skills and to ensure that restoration is made in good faith." *Id.*, at \*62; *see also* H.R.Rep. No. 103–65(I), at 2468.

Nowhere in the legislative record does Congress directly discuss the question presented here—whether "period of service" in § 4316(c) refers to a consecutive or cumulative number of days. Nor does the caselaw on USERRA address the issue.

The absence of discussion of the issue is notable. If service were to be aggregated over a specific period of time, such as a fiscal year, presumably that length of time would have been discussed in the legislative record. Without such specification, it seems most logical that "period" refers to a consecutive number of days for a single term of service. The alternative presumably assumes "period of service before the reemployment" is equivalent to a group of any number of short intervals of service— the person's service as a whole over a certain, unspecified length of time.

The cumulative view of "period of service" also presumes that Congress intended this provision to protect those who serve in short intervals. In support of his interpretation of § 4316(c), Warren argues that it is untenable that the provision would not apply to reservists who serve for short lengths of time—for example, their annual duty of one weekend a month and between fourteen and twenty-one days a year. Indeed, amendments in 1968 to legislation preceding USERRA had sought to protect reservists who had been increasingly discriminated against "because they [had to] attend weekly drills or summer training." S.Rep. No. 90–1477, 1968 U.S.C.C.A.N. at 3421. Still, the legislative history indicates that Congress intended a precursor to § 4311 to address such discrimination. *Id.* (explaining that the section intended to address discrimination against reservists required that employees not be denied retention in employment or other advantage of employment because of Reserve obligations). Congress also recognized that reservists were serving on active duty for extended periods of time, many for more than two years. *Id.* at 3422.

Furthermore, it seems that Congress intended § 4316(c) to apply to reservists with more lengthy absences. In support of USERRA's enactment, the Committee on Veterans Affairs wrote in a Senate report that:

[A]n individual who serves for more than six months would be protected for one year. Recognizing that the pace of technological change in today's workplace can affect an employment position during even an intermediate-term absence, the Committee bill would protect for six months an individual who serves for more than 30 days but less than 181 days.

The Committee does not believe that it is necessary to provide retention rights for retraining purposes for service of less than 31 days.... Under the definition of "reasonable efforts" ... employers would be required to provide training to refresh or update the necessary skills of any individual who is otherwise eligible for reemployment. Additionally, new section 4311 would provide that an individual may not be denied retention in employment by an employer on the basis of service in the uniformed services. The Committee believes that the provisions of new section 4311, which apply without regard to the length of service, would provide adequate protections for short-term service.

S.Rep. No. 103–158, at \*63; *see also* H.R.Rep. No. 103–65(I), at 2468.

USERRA should be interpreted liberally in favor of service members, but nothing in the legislative history suggests that Congress intended reservists to aggregate days over the course of a fiscal year. Therefore, I hold that "period of service" refers to consecutive days of duty before reemployment.[13] Section 4316(c) thus provides extra protection from discharge for those who are absent from work for extended, isolated periods of time.

### d. Application to the Instant Case

█ Warren admits that he served under thirty days on the Pop-up Mission. Adding together the days he served on the mission and those he served on annual training in June 2002, he served more than 30 days.[14] Because § 4316(c) must be interpreted as requiring a consecutive period of service of more than thirty days for relief, however, Warren's claim under this provision fails as a matter of law. IBM's motion for summary judgment is granted as to this claim.

### 4. Violation of New York Military Law § 317

Count IV of Warren's complaint is titled "failure to reemploy a person in the military service in violation of ... § 317" and alleges that IBM violated New York Military Law § 317 by "fail[ing] to restore [Warren] to his previous position."

(Compl. at 14–15). Warren does not argue in the alternative that he was restored to his position and subsequently discharged without cause. It appears that in his complaint Warren is only claiming a violation of paragraph 1 of § 317, regarding reemployment rights, and not paragraph 4, prohibiting discharge without cause.

Because Warren was reemployed after the Pop-up Mission and does not oppose the dismissal of the claim under the federal reemployment provision, § 4312, it might be assumed that he would not oppose dismissal of the state law claim. Instead, Warren argues in his opposition papers that IBM violated paragraph 4 of § 317 and that an issue of fact exists regarding "whether IBM actually had cause for discharging Mr. Warren from its employ." (Warren Mem. at 23–24). IBM counters that the § 317 ¶ 4 claim should be rejected because it was not alleged in the complaint and that, by raising it in opposition papers, Warren is attempting to amend his complaint. (IBM Reply Mem. at 9–10).

█ When a party has a valid claim, however, "he should recover on it regardless of his counsel's failure to perceive the true basis of the claim at the pleading stage, provided always that a late shift in the thrust of the case will not prejudice the other party in maintaining a defense upon

---

13. Commentary on USERRA, provided by IBM, assumes this result without specifically addressing it. See, e.g., Paul J. Luwe, A Call to Colors: Reemployment Rights Under the Uniformed Services Employment & Reemployment Rights Act (USERRA), 27 Mont. Lawyer 21, 29 (Mar.2002) (describing § 4316(c) as bestowing a one-year protection against discharge for employees serving longer than "180 continuous days" and a 180–day protection for those serving 31 to 180 days); Lt. Col. H. Craig Manson, The Uniformed Services Employment and Reemployment Rights Act of 1994, 47 A.F. L.Rev. 55, 79 (1999) (criticizing USERRA because "[i]t is easy to find any number of Reserve and Guard members whose unit missions require their skills for numerous periods of time amounting to far more than thirty days over the course of a year or less. But, if no single period amounts to more than thirty days alone, the member does not receive the special protection from discharge.").

14. The record is not clear on the exact number of days, see supra note 4, but both Warren's deposition and the military record indicate that he served a total of more than 30 days in 2002. (Chao Affirm. Ex. 14; Warren Dep. at 27–29).

the merits." 5 Charles Alan Wright, Arthur R. Miller, *Federal Practice & Procedure* § 1219 at 282 (3d ed.2004) (footnotes omitted).

■ Here, the complaint alleges a violation of § 317 and presents a theory for the claim—the failure to reemploy Warren. Warren should not be prevented from pursuing a different theory under the statute solely because the theory was not specifically stated in the complaint. Instead, the claim should be decided on the merits.

The result might be different if IBM were not already on notice of a comparable federal claim. Indeed, although the statutes are distinct, a state law claim under § 317 ¶ 4 raises substantially the same issues as a federal claim under § 4311—whether IBM discharged Warren for cause or as a result of his membership in the Reserve. IBM is not prejudiced by the inclusion of the state claim because it must defend itself on the federal claim regardless and already has had discovery of the facts at issue.

■ As discussed with respect to the § 4311 claim, material issues of fact exist regarding the motivation behind Warren's discharge. IBM's motion for summary judgment is therefore denied to the extent it seeks dismissal of the claim under § 317 ¶ 4 but granted with respect to the claim under § 317 ¶ 1.

### CONCLUSION

The motion for summary judgment is granted with respect to violations of § 317 ¶ 1, § 4312, and § 4316 and denied as to violations of § 4311 and § 317 ¶ 4. The parties shall appear for a pretrial conference on March 4, 2005 at 10:30 a.m.

SO ORDERED.